NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0704n.06
Filed: September 27, 2006

# United States Court of Appeals

## FOR THE SIXTH CIRCUIT

————————

No. 03-2637

————————

| | | |
|---|---|---|
| Michael Cherry; Linda Germaine; | * | |
| Wayne McIntyre, | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Eastern |
| | * | District of Michigan. |
| Sheriff Robert Pickell; Undersheriff | * | |
| James Gage; Genesee County; | * | |
| Genesee County Sheriff's Department, | * | |
| jointly and severally, | * | |
| | * | |
| Defendants - Appellees. | * | |

————————

Before GUY, BATCHELDER, and JOHN R. GIBSON,[1] Circuit Judges.

————————

PER CURIAM.

Michael Cherry, Linda Germaine, and Wayne McIntyre, deputy sheriffs for the Genesee County Sheriff's Department, appeal the order of the district court granting summary judgment to Sheriff Robert Pickell, Undersheriff James Gage, Genesee

---

[1]The Honorable John R. Gibson, United States Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation.

County, and the Genesee County Sheriff's Department, which we will refer to collectively as the Department. The deputies filed a complaint on August 4, 2000, alleging that the Department retaliated against them for exercising their constitutional rights to free speech. The Department moved for summary judgment, and after oral argument the district court granted the motion. The district court reasoned that while some of the deputies' activities were protected and at least a motivating factor in the adverse actions taken against them, the Department had shown by a preponderance of the evidence that it would have taken the same actions in the absence of the protected activities. We affirm.

The record in this case includes depositions taken in the instant action as well as six days of testimony and exhibits filed in a related action before the Michigan Employment Relations Commission. We recite the facts in the light most favorable to the deputies.

Cherry began working for the Sheriff's Department in April 1992. Since joining the Department, he has been actively involved in the activities of the Deputy Sheriff's Union Local 2259, holding positions on the Executive Board and as the Union's Vice President. Cherry worked for a year and a half as a corrections officer and then was transferred to the paramedics division, an assignment he particularly enjoyed. During this time period, Cherry received a number of disciplinary actions and was removed from the paramedics division at least twice, but was later reinstated as a result of grievance settlements. On September 10, 1998, Cherry was transferred to the courts division to allow new officers to be trained as paramedics. He made numerous unsuccessful requests to be transferred back to paramedics. In addition, Cherry alleges that Sheriff Pickell bypassed him for promotion to sergeant despite his qualifications, refused his requests for training, and denied him overtime and outside employment opportunities.

Cherry alleges that these actions occurred in retaliation for several instances where he exercised his right to free speech. In March 1999, while Cherry was working at the metal detector at the Genesee County circuit courthouse, he and other deputies were discussing their displeasure with the Department's plan to reduce the number of security officers at the courthouse entrance. Circuit Judge Fullerton approached Cherry and asked him what was going on. Cherry informed her of the plan, and the judge subsequently called a meeting with Sheriff Pickell and the other circuit court judges to discuss the matter. Cherry received a written reprimand for discussing the staffing level at the metal detector with a "non-departmental member," and Undersheriff Gage warned him that if something like this happened again "then we go to another level." Cherry also actively supported Sheriff Pickell's opponent, Chuck Melki, in the 2000 election for sheriff. Along with Germaine and McIntyre, Cherry campaigned for Melki, issued a press release criticizing Sheriff Pickell's policies, and wrote a letter to the local newspaper taking issue with its endorsement of Sheriff Pickell. At one campaign event, Sheriff Pickell allegedly approached Melki and Cherry and accused Melki of having his "people go around to the UAW local presidents and talk bad about [him]." Cherry also heard Sheriff Pickell describing him at a polling station on the day of the primary election as "untruthful" and "a malcontent." Finally, Cherry claimed that he overheard Captain Compeau and Corrections Administrator Emigh referring to him as a "shit stirrer" at the office, and when he complained to Undersheriff Gage, no discipline resulted.

Cherry's wife, Linda Germaine, also began working for the Department in 1992. Since 1994, she has been a deputy in the paramedic division, aside from a short stint in road patrol. She is an active member of the Union, having previously served as Vice President. In April 1999, Germaine, along with several other female deputies, filed a grievance about the recent relocation of the women's locker room from an office to an interview room with a window in the door and no lock. The Department denied the grievance with the explanation that the relocation was "temporary" and that the Department was "evaluating new options." Germaine also contacted the

American Civil Liberties Union, claiming that the Department had created a hostile work environment in which female officers were subjected to unequal treatment and harassment. This letter led to an investigation by the Department, and as a result the Union held its grievance in abeyance. In a memorandum to Germaine outlining the results of the investigation, Sheriff Pickell began by stating, "I would like to first point out that your actions by going to the American Civil Liberties Union first without giving me the benefit or courtesy of listening to your complaints was improper." During the 2000 election for sheriff, Germaine wrote a letter to the Flint Journal criticizing Sheriff Pickell. Germaine alleges that the Department retaliated against her as a result of this protected activity by disciplining her on pretextual grounds and denying a transfer request that was later approved through the union grievance process.

Wayne McIntyre, who began working for the Department in the corrections division in 1996, also alleges that he was transferred and passed over for promotions for retaliatory reasons. In the fall of 1999, Sheriff Pickell heard a rumor that McIntyre had made negative comments about him to another patron at Skip's Bar, and he confronted McIntyre about the conversation. Undersheriff Gage also spoke to McIntyre about the rumor and allegedly stated "that if he ever heard anything negative about me again that he would have me right back in here, referring to the jail, turning keys, as well as remove me from the containment team." Gage testified that during this conversation he showed McIntyre an article about someone being fired for speaking poorly of her employer, as "an example of what criticizing your boss and your agency can get you, and that is not good to do." Gage reminded McIntyre of the written standing order prohibiting employees from criticizing the Department and its employees. In his deposition, McIntyre denied that the conversation at the bar had occurred.

The deputies argued before the district court that their conduct involved five instances of protected speech for which the Department retaliated against them.

These instances included: (1) the campaign for Sheriff Pickell's opponent in the 2000 election, (2) Germaine's request for assistance from the ACLU, (3) Germaine's letter to the <u>Flint Journal</u>, (4) Cherry's March 1999 conversation with Judge Fullerton, and (5) McIntyre's alleged conversation in the bar. Following a hearing on the Department's motion for summary judgment, the district court granted the motion. Of the five specific instances of allegedly protected activity, the district court held that the first three amounted to constitutionally protected speech, but the last two did not. The district court held that the three instances of protected speech were at least motivating factors in the adverse employment actions against the deputies, but concluded that the Department had offered "more than sufficient evidence" that it would have reached the same decisions in the absence of the protected conduct, and that there was therefore no "genuine issue of material fact."

On appeal, the deputies argue that the district court erred in concluding that Cherry's comments to Judge Fullerton and McIntyre's alleged conversation about Sheriff Pickell were not protected speech. In addition, they argue that the district court erred in holding that there was no genuine issue of material fact as to whether the Department would have taken the same actions in absence of the protected conduct. The deputies contend that they are entitled to a jury determination on this question in light of the ample evidence of retaliation in the record.

I.

We review the district court's decision to grant summary judgment de novo. <u>Miller v. Am. Heavy Lift Shipping</u>, 231 F.3d 242, 246 (6th Cir. 2000). Summary judgment may be granted only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A dispute over a material fact cannot be "genuine" unless a reasonable jury could return a verdict for the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). In reviewing the district court's decision, we view all the facts and the

-5-

inferences drawn from those facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A public employee has a constitutional right to comment on matters of public concern without fear of retaliation from their government employer, Connick v. Myers, 461 U.S. 138, 140, 144-46 (1983), and government employers cannot silence their employees simply because they disapprove of their speech. Taylor v. Keith, 338 F.3d 639, 643 (6th Cir. 2003). However, in contrast to the government's limited power to restrict the speech of private citizens, the government has greater leeway to control the speech of its employees if the speech threatens to undermine its ability to perform its legitimate functions. Waters v. Churchill, 511 U.S. 661, 671-72 (1994).

To establish a prima facie case of First Amendment retaliation, a public employee must first show that he engaged in constitutionally protected speech. Namely, the plaintiff must show that his speech touched on matters of public concern, Connick, 461 U.S. at 145-46, and if it does, the court must balance the interests of the employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). If the speech is constitutionally protected, the plaintiff must then show that he was subjected to an adverse action or was deprived of some benefit by his employer, and that the protected speech was a 'substantial' or a 'motivating factor' in that action. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). If a plaintiff can establish these elements of the claim, he has established a prima facie case. Then it is up to the employer to show, by a preponderance of the evidence, that it would have taken the same adverse action even in the absence of the protected conduct. Id. The employer's rebuttal involves "issues of fact, however, and may not be decided on a motion for summary judgment unless the evidence 'is so one-sided that one party must prevail as a matter of law.'" Leary v. Daeschner, 349 F.3d

888, 898 (6th Cir. 2003) (citing Boger v. Wayne County, 950 F.2d 316, 322-23 (6th Cir. 1991) (quotation omitted)).

## II.

The district court concluded that Cherry's conversation with Judge Fullerton was not on a matter of public concern because "the point of Cherry's speech was not to present his concerns about the overall safety of the courthouse, but rather to complain to a co-worker about a cutback in his overtime hours. In this regard, Cherry was speaking on an internal personnel dispute." The district court also concluded that McIntyre's alleged statements (which he denies making) about the Sheriff at Skip's Bar were not shown to be on matters of public concern because McIntyre never identified what was allegedly said with enough specificity to determine whether it was protected or not. We conclude that, even if Cherry's conversation with Judge Fullerton and McIntyre's alleged conversation at Skip's Bar were on matters of public concern, the Department's interest in promoting the efficiency of the police department outweighed Cherry and Fullerton's interest in commenting on these matters.

With respect to the deputies' speech that related to matters of public concern, we must balance their interest as citizens in commenting on these matters against the Department's interest in promoting the efficiency of the public services they provide. Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968). This is a matter of law for the court to decide. Farhat v. Jopke, 370 F.3d 580, 593 (6th Cir. 2004).

A government employer has the right to prevent disruption in the workplace and discipline employees for doing or saying things that detract from the efficient and effective operation of the agency. Waters v. Churchill, 511 U.S. 661, 674-75 (1994). In determining whether the government employer has a right to suppress employee speech on matters of public concern, we consider "whether an employee's comments

-7-

meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." Cockrel v. Shelby County Sch. Dist., 270 F.3d 1036, 1053 (6th Cir. 2001) (quotation marks omitted). Relevant to the inquiry are "the manner, time, and place of the employee's expression," as well as "the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388 (1987). Because it is a balancing test, the stronger the showing that the speech was on a matter of public concern, the greater the burden on the employer to show that its interests should prevail. Cockrel, 270 F.3d at 1053. However, in the context of police departments, we have emphasized that the court should show "deference to the city's judgment on the matter of discouraging public dissension within its safety forces." Brown v. City of Trenton, 867 F.2d 318, 322 (6th Cir. 2003).

With respect to Cherry's conversation with Judge Fullerton, the Department argues that its "interest in maintaining internal matters within the department in order to prevent disruption of the department and preserve public trust clearly outweighs any interest Cherry may have in his speech." The Department alleges that Cherry's statement to Judge Fullerton "started rumors, disrupted the department because of the concerns of the court, and wasted resources in addressing concerns about what should have been a non-issue." The deputies respond that Cherry was "not broadcasting detailed courthouse security information to the public at large," but was simply engaging in a "restrained conversation with a member of the bench who worked in the courthouse and had a direct and immediate interest in the safety of her courtroom."

Cherry's speech did in fact lead to problems for the Department. As a result of his comments, which were apparently inaccurate, Judge Fullerton convened a meeting of the other circuit judges and the Sheriff to discuss the security situation. As Sheriff Pickell explained in his deposition, Cherry violated Department policy by speaking

to the judge: "In fact, the Circuit Court Judge really had no business, you know, even talking to him about it. If she has a concern about it, she should go to the Chief Judge of the Circuit Court, and Mike Cherry, if he had a concern about security, he should have gone through his chain of command. He breached security."

In light of the existing chain of command for Cherry to communicate his concerns about the new policy, the balance here weighs in favor of the Department's decision to issue Cherry a written reprimand for disclosing internal information to the judge. The Supreme Court in Connick v. Myers, 461 U.S. 138 (1983), recognized that when "employee speech concerning office policy arises from an employment dispute concerning the very application of that policy to the speaker, additional weight must be given to the supervisor's view that the employee has threatened the authority of the employer to run the office." 461 U.S. at 153. The Sheriff need not "tolerate action which he reasonably believed would disrupt the office, undermine his authority, and destroy close working relationships." Connick, 461 U.S. at 154; see also Brown, 867 F.2d at 323. Therefore, we hold that Cherry's written reprimand for his indiscretion in speaking to the judge about the staffing level at the metal detector does not offend the First Amendment.

McIntyre's claim that the Department chilled protected expression by warning him that if he engaged in future critical speech against the Department he would suffer consequences also fails under the Pickering standard due to the Department's interest in maintaining discipline and decorum within its ranks. Public criticism of the Department violates the Sheriff's Office Work Rules and Regulations, which provide:

> Section 4.10: Office of the Sheriff Genesee County employees shall not make public statements through verbal, written or any other form of expression, criticizing or ridiculing the Sheriff's Office, its policies or other employees, when such statement brings the Sheriff's Office into disrepute. Statements which are defamatory, obscene, unlawful or

which may impair the operation or efficiency of the Sheriff's Office, interfere with [ . . . ] discipline or which show a reckless disregard for the truth, are likewise prohibited.

In Brown, we upheld against facial and as-applied challenges a similar code that prohibited police officers from "publicly criticizing orders given by a superior officer" or "communicating or giving information to any person concerning the business of the police department which is detrimental to the police department." 867 F.2d at 320. We emphasized, "It is one thing for police officers to take a dim view of their boss privately, and quite another thing for them to suggest publicly that they are looking forward to his administration being replaced by one with different priorities." Id. at 322-23. Furthermore, we noted that there was "no showing of any likelihood of substantial misuse of the code, and no showing that the code's mere existence is calculated to discourage the exercise of any constitutional right." Id. at 324; see also Graham v. City of Mentor, 118 Fed. Appx. 27 (6th Cir. 2004) (upholding the constitutionality of a similar police code against facial and as applied challenges), cert. denied, 126 S. Ct. 340 (2005).

The deputies in this case have not demonstrated that the Work Rules and Regulations were calculated to discourage constitutionally protected speech. In alerting McIntyre to these rules after hearing that McIntyre had publicly criticized the Sheriff, the Undersheriff did not stray outside the bounds of what we have considered permissible in the context of paramilitary organizations like the Genesee County Sheriff's Department. See McMurphy v. City of Flushing, 802 F.2d 191, 198 (6th Cir. 1986); see also Connick, 461 U.S. at 154. Accordingly, we affirm the district court's grant of summary judgment to the Department with respect to McIntyre's alleged conversation.

III.

With respect to the three episodes of speech the district court held to be protected, the district court concluded that the department would have taken the same action in refusing to transfer or promote Cherry, in disciplining Germaine, and in transferring and disciplining McIntyre even if they had not engaged in the protected speech. The district court stated that while the determination as to whether an employer has shown by a preponderance of evidence that it would have reached the same decision even in the absence of protected conduct is ordinarily a question of fact for the jury, the record in this case was so one-sided that the Department was entitled to judgment as a matter of law. The issues in this case did not involve discharge, but rather bypassing promotions, discipline, and denial of transfer. The court also observed that failure to promote arises in a less black and white scenario than termination or demotion, and the give and take involved in a promotion decision is a discretionary decision composed of many factors.

Cherry contends his requests for transfer out of the courts division were denied because of his speech in the 2000 election. However, Cherry had initially been placed in the courts division in 1998 because of his history of citizen complaints and discipline. The Captain who denied at least some transfer requests testified that his action was based on Cherry's history of citizen complaints and his disciplinary history. With respect to the failure to promote Cherry, the collective bargaining agreement expressly gave Pickell the option of choosing one of the top three candidates on the promotion list. The evidence was that Pickell consulted with senior officers in the Department who agreed that Cherry should not be promoted because of his lack of trustworthiness and lack of commitment to the Department, among other similar reasons.

As to Germaine's complaints of retaliatory discipline, the district court held that there was no genuine issue of fact as to whether defendants would have disciplined her even in the absence of the complaint to the ACLU, as "clearly defendants would have done so." Germaine conceded that she had committed the disciplinary

-11-

infractions of using foul language to her sergeant, being five and a half hours late in picking up her vehicle, and being out of her district on more than one occasion.

McIntyre alleged that he was removed from the paramedic division and placed in the courts division as retaliation for supporting Melki in the 2000 election. But the evidence indicated that someone had to be transferred from paramedics to courts for budgetary reasons, and McIntyre had the lowest seniority in the paramedics division. McIntyre also cited "minor" discipline meted out to him, but the record shows McIntyre was disciplined for an untruthful statement, which he admitted making, and for an accident, which he also admitted.

In contrast to the positive employee evaluations of the deputies filed by some of their supervisors, there are also filings and testimony by other members of the Department criticizing their abilities and attitudes. All three employees have disciplinary actions in their files based on violations of the Department's general orders. The Department also presented evidence that the deputies were not pleasant people to work with and may have been abusing the union grievance process, a factor that the Department is entitled to take into account when making discretionary decisions about promotions and transfers. No reasonable jury could have found these disputed decisions would have been different had the deputies not engaged in the protected speech.

We affirm the judgment of the district court.