RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0170p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

JOSEPH BOULTON, Sergeant,

        *Plaintiff-Appellant,*

    *v.*

CHRISTOPHER SWANSON; GENESEE COUNTY SHERIFF'S DEPARTMENT; GENESEE COUNTY,

        *Defendants-Appellees.*

No. 14-2308

> Appeal from the United States District Court .
> for the Eastern District of Michigan at Detroit
> No. 2:13-cv-13543—Nancy G. Edmunds, District Judge.

Argued: June 10, 2015

Decided and Filed: July 29, 2015

Before: KEITH, CLAY, and STRANCH, Circuit Judges.

_____

## COUNSEL

_____

**ARGUED:** Nanette L. Cortese, Bingham Farms, Michigan, for Appellant. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees. **ON BRIEF:** Nanette L. Cortese, Bingham Farms, Michigan, for Appellant. Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellees.

_____

## OPINION

_____

JANE B. STRANCH, Circuit Judge. Joseph Boulton provided testimony—as a union member at a contract arbitration proceeding—that contradicted the testimony of his superior officer in the Genesee County Sheriff's Office. He was subsequently demoted from his position

as sergeant and suspended for several days without pay. Boulton brought claims against Genesee County, arguing that the County violated the First Amendment by disciplining him pursuant to the County's policy barring criticism of the Sheriff's Office. We hold that Boulton's speech at the arbitration was protected by the First Amendment. However, because he cannot show that the demotion and suspension resulted from the County's policy against criticism, rather than his other extensive misconduct, we affirm the district court's grant of summary judgment to the County. We likewise affirm the denial of leave for Boulton to file an extremely late Third Amended Complaint.

## I. Background

### A. Facts

Joseph Boulton was a sergeant in the Genesee County Sheriff's Office, working in the county jail. He was also a leader in his union. In April 2012, the union initiated mandatory contract arbitration with the Sheriff's Office, pursuant to Michigan's Public Act 312. *See* Mich. Comp. Laws 423.231, et seq. At the arbitration, Undersheriff Swanson testified regarding Taser, firearm, and CPR training for employees of the Sheriff's Office. Boulton testified later in the arbitration that Swanson had misrepresented the degree of training that employees of the Office had received. Boulton did not put the transcript of his testimony on this issue in the record, but both the Sheriff and Swanson acknowledged that Boulton had contradicted Swanson. Boulton also shared his concerns about inadequate training on firearms, tasers, and CPR to "co-workers, colleagues, family, friends and members of Genesee County both during [his] time on duty and time off duty as a private citizen." He presents no evidence, however, that Sheriff's Office decision-makers were aware of his comments outside the arbitration.

The day after Swanson testified about firearm training, Boulton was instructed to wear his uniform or business attire to subsequent arbitrations. When he wore a blazer and golf shirt the following days, he was investigated for failing to follow a direct order. Soon after, there was a short power outage at the county jail, and Boulton was told that there would be an internal investigation of his actions during the outage; the record includes no documentation of that investigation. In July 2012, the investigation regarding proper attire was closed. At the same time, however, Boulton was notified that several of his subordinates had brought complaints

against him and that the department was starting a new investigation into those complaints. Boulton was also notified that he was "forbidden to inquire with any witnesses or investigators as to the nature of the investigation" and that any such inquiries would be interpreted as insubordination and witness intimidation. Boulton admitted in an interview at the end of the investigation that he asked his subordinates for details about the investigation and their interviews with management, despite the explicit instruction not to do so. Immediately before this admission, Boulton lied about his behavior, denying that he had spoken to subordinates.

Following the investigation, Boulton was suspended without pay for several days and demoted from his position as sergeant. According to the Notice of Disciplinary Action, he was demoted for creating a "hostile" and "unprofessional" environment for his subordinates and also for making derogatory and sexist comments to female pretrial detainees in the jail.

Boulton contends that Swanson initiated the investigation as retaliation for his statements about training, pointing to a text message from one of his subordinates to another stating that Swanson was seeking complaints about him. Two other members of the department also told him that Swanson was "out to get him." Boulton notes that several other members of the department engaged in some form of inappropriate behavior—and particularly sexually inappropriate behavior—but were not disciplined.

The Notice of Disciplinary Action lists several sections of the department work rules and regulations that Boulton was found to have violated, including "Section 4.10 Criticism." In interrogatory responses, the County also included "criticism of the Office of the Genesee County Sheriff" among the reasons Boulton was disciplined, also citing Section 4.10 (the Rule against Criticism). Section 4.10 provides:

> Office of the Sheriff Genesee County employees shall not make public statements through verbal, written or any other form of expression, criticizing or ridiculing the Sheriff's Office, its policies or other employees, when such statement brings the Sheriff's Office into disrepute. Statements which are defamatory, obscene, unlawful or which may impair the operation or efficiency of the Sheriff's Office, interfere with discipline, or which show a reckless disregard for the truth, are likewise prohibited.

**B. Procedural History**

Boulton initially filed this lawsuit in Michigan state court pursuing relief under only state law. In a Second Amended Complaint, Boulton added a claim under 42 U.S.C. § 1983 for retaliation against speech protected by the First Amendment. The defendants removed the case to federal court, and the court retained jurisdiction over only the federal constitutional claim. After discovery, the parties filed cross-motions for summary judgment. The defendants' motion pointed out that on the constitutional claim, Boulton sought liability against only the county. Three days later, Boulton filed a motion seeking leave to file a Third Amended Complaint, representing that he had not learned the extent of the Sheriff's involvement in his termination until a late deposition. The court granted leave to amend, but the defendants filed a motion to reconsider, notifying the court that all of the supposedly new information regarding the Sheriff's role had previously been available to Boulton. The court reconsidered, struck the Third Amended Complaint, and denied the plaintiff's motion to reconsider/renewed motion to amend. The court then granted summary judgment to the County and dismissed Swanson.

Boulton timely appealed from both the grant of summary judgment and the orders denying him leave to amend his complaint.[1]

## II. Summary Judgment

We review a district court's grant of summary judgment de novo. *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). In considering a motion for summary judgment, we must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Id*. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue as to any material fact such that the movant is entitled to a judgment as a matter of law." *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013) (internal quotation marks omitted); *see* Fed. R. Civ. P. 56(a), (c).

---

[1]Before the district court, Boulton conceded that he had pled his federal claim only against the county. He does not seek to rescind that concession on appeal, so we do not review the dismissal of defendant Christopher Swanson.

For a public employee such as Boulton to establish a prima facie case of retaliation in violation of the First Amendment, he must demonstrate

> (1) that [he] was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused [him] to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of [his] constitutional rights.

*Leary v. Daeschner*, 228 F.3d 729, 737 (6th Cir. 2000). "If the employee establishes a prima facie case, the burden then shifts to the employer to demonstrate by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct. Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

Because Boulton seeks relief from the county, he must further prove that his injury was caused by an unconstitutional policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (emphasis in original). A plaintiff may show that the municipality was responsible in four ways: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Boulton attempts the first approach—proving an illegal official policy.

The County challenges three aspects of Boulton's case. It argues that Boulton's speech was not protected by the First Amendment; that it would have disciplined Boulton to the same extent if he had not spoken regarding the training policies; and that Boulton fails to establish that the County, rather than individual officials, was responsible. The district court concluded that Boulton's speech is not entitled to protection because he made the statements during a union

arbitration and that Boulton failed to show that the Rule against Criticism is an unconstitutional policy.

## A. First Amendment Protection

The district court erred in determining that Boulton's speech was deprived of First Amendment protection because he made it as a union member in the course of an arbitration proceeding. In *Pickering v. Board of Education*, 391 U.S. 563 (1968), the Supreme Court rejected the proposition that public employees "may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with [their work]." *Id*. at 568. The Court nonetheless noted that there must be "a balance between the interests of the [public employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* Two questions arise in addressing a public employee's free speech claim. First, we must answer the threshold inquiry—did the employee speak as a "citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). If so, we then balance the justifications for a speech restriction against the employee's free speech interest. *Id.*

The threshold inquiry, in turn, has two components: whether the employee was speaking as a citizen and whether the topic was a matter of public concern. *Connick v. Myers*, 461 U.S. 138 (1983), clarifies what makes a topic a matter of public concern. Myers, an assistant district attorney who was displeased with a proposed transfer, was fired for insubordination after she circulated a survey to her coworkers asking about their experiences with transfers, supervisors, and the office culture. *Id.* at 140–41. Refusing to "presume that all matters which transpire within a government office are of a public concern," the Court noted that it would determine whether an employee's speech addresses a matter of public concern by examining "the content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–49. The Court reviewed the survey and found that the focus of the questions (which addressed trust in various supervisors, level of office morale, and need for a grievance committee) was merely an extension of "Myers' dispute over her transfer" as opposed to being of "public import in evaluating the performance of the District Attorney as an elected official." *Id.* at 148. The fact

that the communication was largely focused on matters of private concern, however, did not eliminate the protection of those aspects that were of public concern. Because the survey included a question addressing a public concern (pressure on assistant district attorneys to work on political campaigns), the Court examined the competing interests, balancing the limited extent to which the survey touched on a matter of public concern with the employer's interest in maintaining discipline; it found the employer's interest to be stronger. *Id.* at 149–53.

Our court has elucidated the distinction between matters of public concern and personnel matters. Although government effectiveness and efficiency could generally be considered a matter of public concern, we have found mere assertions of incompetence and poor management decision-making to be run-of-the-mill employment disputes—particularly when the recommended course of action would benefit the employee. *See Rahn v. Drake Center, Inc.*, 31 F.3d 407, 413 (6th Cir. 1994); *Barnes v. McDowell*, 848 F.2d 725, 734–35 (6th Cir. 1988). In contrast, speech addresses a matter of public concern when it alleges corruption and misuse of public funds, *Chappel v. Montgomery Cnty. Fire Protection Dist. No. 1*, 131 F.3d 564, 576–77 (6th Cir. 1997); failure to follow state law, *Banks v. Wolfe Cnty. Bd. of Educ.*, 330 F.3d 888, 896–97 (6th Cir. 2003); major state policy decisions, *Jackson v. Leighton*, 168 F.3d 903, 910 (6th Cir. 1999); or discrimination of some form, *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 181–82 (6th Cir. 2008).

The second component of the threshold inquiry, whether an employee is speaking as a citizen, was initially explained in *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006), which held that a public employee is not speaking as a citizen when he "make[s] statements pursuant to [his] official duties." The plaintiff in *Garcetti*, a deputy district attorney, was fired for writing an internal memorandum recommending dismissal of a case on the basis of purported government misconduct. Noting that there can be First Amendment protection for expressions made at work and on the subject of Ceballos' employment, the Court found the "controlling factor" to be "that his expressions were made pursuant to his duties as a calendar deputy." *Id.* at 420–21. "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply

reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* at 421–22.

After *Garcetti*, we held that most jobs carry with them an inherent duty of internal communication. In *Weisbarth v. Geauga Park Dept.*, 499 F.3d 538 (6th Cir. 2007), a park ranger was terminated as a result of her conversations with a personnel consultant hired by the department. *Id.* at 540. We held that her conversations with the consultant were "ad hoc or de facto duties" of the job, and she therefore made statements as an employee and not as a citizen. *Id.* at 544. We have also categorized as part of the general duty of internal communication a memorandum from a police officer to his chief about the wisdom of a pending staff reduction, *Haynes v. City of Circleville, Ohio*, 474 F.3d 357, 364 (6th Cir. 2007), and a teacher's complaints to her supervisors that her class sizes were too large, *Fox v. Traverse City Area Pub. Sch. Bd. of Educ.*, 605 F.3d 345, 348–49 (6th Cir. 2010).

Determining whether speech is unprotected due to the *Garcetti* exception or because it is not on a matter of public concern has proven challenging. For example, in *Haynes*, we determined that speech owed its existence to professional responsibilities when an employee engaged in "controlled venting" by wrapping his equipment in Christmas paper and attaching a "Do Not Open Until Christmas" tag—in March. 474 F.3d at 360–61, 364. Similarly, in *Fox*, we cited to *Barnes v. McDowell*—a case on whether a dispute was a matter of public concern—as support for the proposition that a teacher was speaking as an employee. 605 F.3d at 349; *see also Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 541–42 (6th Cir. 2012) (applying *Haynes* and *Fox* to characterize speech that constituted merely a personnel dispute—and would therefore not be a matter of public concern—as being made pursuant to official duties).

In this case, the district court offered an even broader reading of *Garcetti*, categorizing Boulton's speech as "speech that owes its existence to a public employee's professional responsibilities," on the basis that Boulton could not have participated in the union or the arbitration if he were not an employee of the Sheriff's Office. R. 40, PageID 1279; *see Garcetti*, 547 U.S. at 421. This expansive reading was the subject of dispute in *Weintraub v. Bd. of Educ. of City Sch. Dist. Of the City of New York*, 593 F.3d 196 (2d Cir. 2010). There the Second Circuit held that a teacher's union grievance was unprotected speech because "[t]he lodging of a

union grievance is not a form or channel of discourse available to non-employee citizens." *Id.* at 204. Judge Calabresi, in dissent, argued that such an approach read *Garcetti* too broadly and "would allow retaliation against much speech that seems to me to require protection and to remain protected after *Garcetti.*" *Id.* at 206 (Calabresi, J., dissenting). In fact, the *Pickering* Court explicitly noted the value of public employees using knowledge acquired by virtue of their employment to engage in public debate. *Id.* at 206–07 (quoting *Pickering*, 391 U.S. at 572). The dissent suggested that the wiser course is to limit the *Garcetti* exception to its situation: where the employee is speaking as the instrument of the state, that speech is not protected.

The Supreme Court put this issue to rest in *Lane v. Franks*, 134 S. Ct. 2369 (2014), by expressly rejecting an expansive reading of the *Garcetti* exception. Noting that "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment," the Court clarified, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379. Reiterating that "public employees do not renounce their citizenship when they accept employment," the Court again proclaimed the importance of public-employee speech that relates to the public employment itself:

> There is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For government employees are often in the best position to know what ails the agencies for which they work. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.

*Id.* at 2377 (citation, internal quotation marks, and alteration omitted). The concurring justices likewise considered a "straightforward application of *Garcetti*" to be limited to asking whether the employee was speaking "pursuant to his ordinary job duties." *Id.* at 2383 (Thomas, J., concurring). *Lane* thus highlights the importance of properly categorizing speech when undertaking the two part inquiry into whether speech is protected. The question of whether speech concerns a personnel matter is a question about whether it addresses a matter of public concern, not whether the employee is speaking as a citizen. This is true, our sister circuits have noted, because "a public employee may speak as a citizen even if his speech involves the subject matter of his employment." *Dougherty v. Sch. Dist. Of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014); *see also Mpoy v. Rhee*, 758 F.3d 285, 294–95 (D.C. Cir. 2014). *Dougherty* finds support for this

determination in *Lane's* narrowing of the *Garcetti* exception "by including 'ordinary' as a modifier to the scope of an employer's job duties," and by *Lane's* admonishment that speech is not transformed into "employee—rather than citizen—speech" simply because it "concerns information acquired by virtue of [the speaker's] public employment." *Id.*

After *Lane*, the *Garcetti* exception to First Amendment protection for speech residing in the phrase "owes its existence to a public employee's professional responsibilities" must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment. It is axiomatic that an employee's job responsibilities do not include acting in the capacity of a union member, leader, or official. In fact, Michigan law makes it illegal for a public employer to "dominate . . . or interfere with the formation or administration of any labor organization." Mich. Comp. Laws § 423.210(b). We therefore hold that speech in connection with union activities is speech "as a citizen" for the purposes of the First Amendment.

The next question is whether Boulton's statements at the arbitration concerning firearm, Taser, and CPR training addressed a matter of public concern. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48. In this circuit, there is not a per se rule regarding union-related speech by a public employee. It may or may not address a matter of public concern. *Boals v. Gray*, 775 F.2d 686, 693 (6th Cir. 1985). Instead, the court must determine "the *point* of the speech in question." *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1187 (6th Cir. 1995) (emphasis in original); *see also Rodgers v. Banks,* 344 F.3d 587, 600 (6th Cir. 2003) ("Although Plaintiff's underlying motive in writing the memo might have been to complain about incompetent management, our duty is not to discern her underlying motive, but rather to evaluate her point as it is presented in the speech.").

Boulton's speech occurred during a contract arbitration between the sergeant's union and the County, which dealt with a number of economic issues. The transcript of that part of the arbitration was not submitted to the court, but the record does contain Swanson's testimony to which Boulton was responding. Swanson's testimony came during a broader discussion of sergeant-level positions that had recently been eliminated, including a training coordinator position. The union had raised this issue as part of an argument that because the union had made

other concessions, the Sheriff's Office could afford additional salary increases. In this context, Boulton's statement worked against his own personal interests and those of his fellow union members.  If the Sheriff's Office was not providing adequate training without a training coordinator, then the Office would have to pay to fill the position again, reducing funds available for salary and benefits to the union member employees.  This context weighs in favor of finding that Boulton's statements addressed a matter of public concern.

The content of Boulton's statement also indicates that it addressed a matter of public concern.  Proper training in use of force, including by firearm and Taser, is an important concern of the Constitution and required by Michigan state law.  Concerns regarding law enforcement's use of excessive force are matters of public concern.  *Taylor v. Keith*, 338 F.3d 639, 645–46 (6th Cir. 2003); *see also Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law . . . .").  Similarly, Boulton's statements regarding CPR training reflect the significant public interest in protecting the health of pretrial detainees in the Genesee County Jail.  *See Catletti ex rel. Estate of Catletti v. Rampe*, 334 F.3d 225, 230 (2d Cir. 2003) ("The quality of mental health services provided in the County prison is plainly a matter of public concern.").  The public has a strong interest in knowing whether jail officials are ill-equipped to provide emergency care to prisoners.

Boulton has established that his remarks during the arbitration hearing were made as a citizen and addressed matters of public concern.  This satisfies the threshold inquiry for First Amendment protection and that protection is not lost because Boulton spoke as a union member at a contract arbitration proceeding.  The County has presented no countervailing interest in repressing his speech, either at the district court or before this court.  Boulton's exercise of his First Amendment right to speak on issues of public importance is therefore protected from retaliation.  *Pickering*, 391 U.S. at 574–75.

**B. Municipal Liability**

Even assuming that Boulton's protected speech was a but-for cause of his suspension and demotion, however, he fails to adequately tie any constitutional violation to the County policy. Because Boulton pled his claim only against Genesee County, he must prove that the County

itself was to blame, rather than its individual officials. *Monell*, 436 U.S. at 694–95. Boulton argues that his burden is satisfied because he was fired pursuant to § 4.10 of General Order 1, the County's official policy barring criticism of the Sheriff's Office. "[I]t is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

The County suggests that our precedent bars any claim arising from the criticism policy. In *Brown v. City of Trenton*, 867 F.2d 318 (6th Cir. 1989), we reviewed for overbreadth a city ordinance that allowed discipline for "publicly criticizing orders given by a superior officer and communicating or giving information to any person concerning the business of the police department, which is detrimental to the police department." *Id.* at 323 (internal quotation marks and alterations omitted). Relying on the principle that "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications," *id.* (quoting *New York v. Ferber*, 458 U.S. 747, 771 (1982)), we declined to find the policy unconstitutionally overbroad absent evidence that it had actually been misapplied. Because we found, in that case, that the officers had not engaged in protected speech, there was "no showing of any likelihood of substantial misuse of the code, and no showing that the code's mere existence is calculated to discourage the exercise of any constitutional right." *Id.* at 324. The code was upheld. *See also Graham v. City of Mentor*, 118 F. App'x 27, 31 (6th Cir. 2004) (upholding the constitutionality of a similar police code against facial and as-applied challenges), *cert. denied*, 546 U.S. 815 (2005)).

In particular, the County directs our attention to *Cherry v. Pickell*, 188 F. App'x 465, 471–72 (6th Cir. 2006), which applied *Brown* to uphold the Genesee Sheriff's Office's criticism rule. The plaintiffs in that case, sheriff's deputies, alleged that they were disciplined for protected speech and also challenged the rule as facially unconstitutional. Because the disciplinary actions would have occurred regardless of the protected speech and there was no showing that the policy was "calculated to discourage constitutionally protected speech," *id.* at 471, we declined to uphold a freestanding facial challenge to the policy, *id.* at 470–71.

As the County acknowledged at argument, our precedent does not foreclose a properly supported as-applied challenge to the Genesee County policy, or policies like it. *Cherry*, *Brown*,

and *Graham* held that, in light of the heavy government interest in promoting order within a law enforcement agency, criticism policies are not *facially* unconstitutional. But we were explicitly agnostic in *Brown* about whether such a policy could be unconstitutional as applied to particular speech:

> As far as the provisions of the city code at issue here are concerned, anyone with an active imagination can readily dream up hypothetical situations in which corrupt or unscrupulous or unbalanced officials might apply the code in an unconstitutional manner.
>
> . . . .
>
> To devise a detailed code of police conduct incapable of misapplication would be utterly impossible, or so we should find it, but that does not mean that the Constitution bars codes of police conduct generally. Most chiefs of police are neither corrupt nor mad, and while any police chief can make a mistake, just as any of the rest of us can, courts are fully capable of correcting such mistakes. If Chief Lilienthal had disciplined Officer Brown for publicly exposing corruption in the City of Trenton police force, for example, or for publicly criticizing unconstitutional orders, we have no doubt that Judge Suhrheinrich, upon request, would have taken appropriate action—and if he had not, we would have.

*Brown*, 867 F.2d at 324. Nothing in *Brown* or its progeny limits the as-applied analysis of police codes of conduct.

Although Boulton could potentially bring an as-applied challenge to the policy, he fails to establish that his demotion and suspension were actually a result of the policy. He has two theories why he would not have been disciplined absent his protected speech: (1) that the undisciplined misbehavior of others in the department reveals that his other charges were not sufficiently serious to merit the discipline he received and (2) that those other disciplinary charges resulted from a "witch hunt." The first theory could have potentially supported an as-applied challenge and *Monell* liability. If Boulton's violations were insufficient to merit the discipline he received absent his violation of the criticism policy, then that policy would have been an actual motivating force of his demotion and suspension. But Boulton's comparator analysis fails because the other employees' misconduct is substantially less egregious than his own. None of the other officers harassed prisoners, interfered with an internal investigation, or lied to his superior officers during an internal investigation.

Boulton's other theory, that Swanson and others in the department were spurred by his protected speech to go on a witch hunt and identify misconduct, cannot support *Monell* liability because there is no causal link between the policy and the purported unconstitutional action. The criticism policy authorizes Sheriff's Office supervisors to investigate criticism of the office, not other, unrelated misconduct. And Swanson could pursue such a witch hunt regardless of whether the criticism policy existed. The policy would therefore not be a motivating force for a witch hunt. Because neither of Boulton's theories is sufficient here to support a *Monell* claim, Boulton's claim fails.

### III. Denial of Leave to Amend

Boulton also seeks review of the district court's denial of leave to file his Third Amended Complaint. In that complaint, he sought to plead facts relating to the Sheriff's involvement in his suspension and demotion, as well as further facts regarding his statements about the department's training policies made outside the arbitration proceeding. This court reviews a denial of leave to amend a pleading for abuse of discretion, unless the district court denied leave based "on the legal conclusion that an amended complaint could not withstand a motion to dismiss." *Morse v. McWhorter*, 290 F.3d 795, 799 (6th Cir. 2002).

The district court initially granted leave to amend the complaint based on Boulton's representation that he was not aware of the degree of the Sheriff's involvement in disciplinary proceedings prior to the Sheriff's deposition in the present case. The defendants then put forward evidence that Boulton was, in fact, aware that the Sheriff was involved in disciplinary proceedings, and the court granted a motion for reconsideration, striking the Third Amended Complaint. Before this court and in his own motion for reconsideration before the district court, Boulton argues that he was aware that the Sheriff was involved in disciplinary proceedings to some extent—but not to the full extent that he discovered during the deposition. The district court rejected this argument, concluding that Boulton knew enough about the Sheriff's involvement to include him as a defendant from the beginning—relying, in part, on the fact that Boulton had met with the sheriff to address the alleged retaliation.

The district court did not abuse its discretion in denying leave to amend. By the time Boulton filed his Second Amended Complaint, he had sufficient knowledge of the Sheriff's

involvement in disciplinary proceedings to include him as a defendant.  It was not an abuse of discretion for the court to refuse to allow an amended pleading that would introduce an entirely new defendant—as well as a new theory of liability against the County.

## IV.  Conclusion

For the reasons discussed above, we AFFIRM the judgment and orders of the district court.