NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0476n.06

No. 17-2031

<table>
<tr><td>UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT</td><td>)</td><td rowspan="11"><strong>FILED</strong><br>Sep 20, 2018<br>DEBORAH S. HUNT, Clerk</td></tr>
</table>

| | |
|---|---|
| NATASHA HENDERSON, | ) |
| | ) |
| Plaintiff-Appellant, | ) |
| | ) |
| | ) ON APPEAL FROM THE |
| v. | ) UNITED STATES DISTRICT |
| | ) COURT FOR THE EASTERN |
| CITY OF FLINT, MICHIGAN; KAREN WEAVER, | ) DISTRICT OF MICHIGAN |
| | ) |
| Defendants-Appellees. | ) OPINION |
| | ) |

BEFORE: CLAY, STRANCH, and LARSEN, Circuit Judges.

STRANCH, J., delivered the opinion of the court in which CLAY, J., joined except as to Part II.B., with respect to which CLAY, J. (pp. 17–22), delivered a separate dissenting opinion. LARSEN, J. (pp. 18–31), delivered a separate opinion dissenting in part and concurring only in the judgment regarding the issue discussed in Part II.B.

**JANE B. STRANCH, Circuit Judge.** Plaintiff Natasha Henderson alleges she was wrongfully terminated from her position as City Administrator of the City of Flint for reporting the potentially unethical or unlawful behavior of Flint's Mayor, Karen Weaver. Henderson brought a First Amendment retaliation claim and a claim under Michigan's Whistleblower Protection Act (WPA). Henderson appeals the district court's grant of summary judgment in favor of the Defendants. Because Henderson has failed to demonstrate that her report occurred in her capacity as a private citizen, we **AFFIRM** with respect to the First Amendment claim. Because disputed issues of material fact exist with respect to the Defendants' motivation for firing Henderson, we **REVERSE** with respect to the WPA claim.

## I. BACKGROUND

The crux of this case is Henderson's allegation that she was fired because she urged Flint's Interim Chief Legal Officer Anthony Chubb to investigate potentially unethical conduct by Mayor Weaver. According to Henderson, Weaver directed that private donations be funneled to an organization she formed under 26 U.S.C. § 527 (527 Organization) rather than a City-approved nonprofit fund administered by the Community Foundation of Greater Flint. Henderson alleges that Chubb informed Weaver of Henderson's request for an investigation and that this caused her to be fired.

The City of Flint was under continuous receivership from November 2011 through April 2015. During that period, an Emergency Manager held the managerial authority normally vested in elected officials, such as the city's mayor. This receivership period coincided with the widely publicized water crisis in Flint, in which residents were exposed to highly elevated levels of lead in Flint's drinking water and suffered through an outbreak of Legionnaires' Disease that resulted in the death of at least 10 residents and sickened many more.[1]

In December 2014, Flint's Emergency Manager, Darnel Early, appointed Natasha Henderson as the City Administrator. She began serving in that post in February 2015. In November 2015, Karen Weaver was elected Mayor of Flint. Weaver's election marked a transitional period for Flint's local government. In April 2015, the Emergency Manager had issued Orders 3 and 20, which restored some of the Mayor's executive authority. Order 3 specified that the City Administrator served "at the pleasure of the Mayor, City Council and Emergency Manager

---

[1] Legionnaires' Disease is a form of pneumonia caused by the Legionella bacteria, which is frequently found in untreated water or soil. *See Legionnaires' Disease*, Mayo Clinic (Jan. 11, 2018), https://www.mayoclinic.org/diseases-conditions/legionnaires-disease/symptoms-causes/syc-20351747.

or Receivership Transition Advisory Board [(RTAB)]."[2] (R. 29-6, PageID 330) Order 20, however, specified that the City Administrator could not be terminated without the approval of RTAB. In January 2016, RTAB further expanded the Mayor's authority and passed resolution 2016-1, which empowered the Mayor to appoint the City Administrator and the heads of the city's executive departments. Thus, by January 2016, Weaver's authority to select agency department heads and the City Administrator was re-established and limitations upon the Mayor's executive authority to hire and fire employees had been greatly curtailed.

In December 2015, in response to the water crisis, Weaver declared a state of emergency. Henderson initially expressed concerns that the declaration would undermine support from the governor and the state, but she ultimately acceded to Weaver's insistence on the necessity of the declaration and, in fact, wrote much of the actual declaration. (R. 33-10, PageID 789–90)

After the Mayor declared a state of emergency, many individuals contacted the Mayor's office to donate funds to assist those affected by the water crisis. In response, Flint established the Safe Water/Safe Homes initiative, administered by the Community Foundation of Greater Flint. (R. 33-5, PageID 729; R. 33-10, PageID 796) At approximately the same time, the Mayor was involved in creating the 527 Organization, the Caring for Flint Fund, occasionally referred to as the Karen About Flint Fund. (R. 33-17, PageID 884–904) The 527 Organization was formed as part of a strategy to secure resources for lead abatement and community development projects in Flint. Its mission included hiring lobbyists to secure funding for Flint and conducting public outreach in support of lead abatement efforts.

---

[2] Under Michigan's emergency management statute, emergency managers are empowered to assist local municipalities to transition from emergency management to independent governance. *See* Mich. Comp. Laws § 141.1562. To facilitate such transitions, emergency managers are authorized to recommend to the Michigan governor when municipalities are ready to transition out of emergency management. *Id.* The statute provides for the Governor to appoint Receivership Transition Advisory Boards that maintain fiscal management and oversight as municipalities transition to full autonomy. *Id.* § 141.1563.

On February 9, 2016, Maxine Murray, Weaver's secretary, privately approached Henderson at work and expressed concern that the Mayor had instructed her to direct potential donors from the Safe Water/Safe Homes Fund to the Mayor's 527 Organization. (R. 29-11, PageID 364) Henderson emailed Chubb the following day to express concern and to request that he initiate an investigation. (R. 29-11, PageID 364) Henderson contacted Chubb again on February 12 to inquire about the status of his investigation. (R. 29-11, PageID 366) Chubb informed Henderson that he had contacted the state ethics board due to his concern that investigating Mayor Weaver might present a conflict of interest for Chubb and his staff. (R. 29-11, PageID 366)

On February 12, the Mayor terminated Flint's Chief of Police and Fire Chief. That afternoon, Henderson arrived at the Mayor's office to find the Mayor, Chubb, and Interim Human Resources Director Charlie McClendon in a meeting together. Henderson was provided a written termination letter, dated the previous day, which gave no reason for her firing. (R. 29-10, PageID 359) Henderson asked why she was being terminated. According to Henderson, the Mayor first responded that the State of Michigan would no longer pay for her salary. (R. 33-13, PageID 860) When Henderson responded that her salary was paid by Flint, not the state, Weaver responded that Henderson was being terminated for her alleged failure to provide timely information to her about the Legionnaires' Disease outbreak. (R. 33-13, PageID 860; R. 29-5, PageID 318)

Weaver testified that Henderson had not informed her about the outbreak prior to February 2016. Weaver stated that Henderson's failure to promptly inform her of the outbreak was the "last straw" and triggered Henderson's termination. (R. 33-10, PageID 831) Henderson testified that she informed Weaver of the Legionnaires' Disease outbreak over dinner on two separate occasions prior to the Mayor's election in November 2015. (R. 29-3, PageID 292) Weaver confirmed that

she and Henderson had dinner together on two occasions prior to her election, but stated that the outbreak was never mentioned. (R. 33-10, PageID 781) Henderson sent two emails to Weaver in mid-January 2016 discussing the Legionnaires' Disease outbreak, which she alleges show Weaver's prior knowledge of the outbreak. Henderson sent one email to Weaver, without anything written in the body, with a subject line that read "87 cases since June 2014, 10 fatal." (R. 33-15, PageID 877) In the second email Henderson sent, she apparently copied information regarding the causes of Legionella infection and the manner the disease is transmitted. (R. 33-15, PageID 878) Local news sources reported on the Legionnaires' Disease outbreak on February 9, 2016. (R. 29-16, PageID 435–36)

Chubb was subsequently terminated, challenged his termination, and then entered a $56,000 settlement with the City. (R. 33-5, PageID 728) Chubb testified after his termination that he had not informed the Mayor of Henderson's report to him before the Mayor fired Henderson and did not do so until February 24 or 25, well after the February 12 termination date. (R. 33-5, PageID 730; R. 33-29, PageID 955)

Henderson subsequently filed suit, alleging First Amendment retaliation, violation of the WPA, and defamation. The parties conducted extensive discovery, after which the Defendants jointly moved for summary judgment. In a lengthy written opinion, the district court granted summary judgment in favor of the Defendants on all three of Henderson's claims. Henderson filed a timely notice of appeal. Henderson disputes only her First Amendment and WPA claims.

## II. ANALYSIS

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Brown v. Lewis*, 779 F.3d 401, 410 (6th Cir. 2015). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. AT&T Mobility Servs., LLC*, 847 F.3d 384, 391 (6th Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In performing this evaluation, "[w]e must view all evidence in the light most favorable to the nonmoving party." *Id.* (citing *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 301 (6th Cir. 2016)). Summary judgment is also appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## B. First Amendment Retaliation Claim

Henderson alleges that she was terminated because she requested that Chubb initiate an investigation into the Mayor's conduct with respect to the 527 Organization. To prevail on her First Amendment retaliation claim, Henderson must demonstrate three elements: "(1) [she] engaged in constitutionally protected conduct; (2) an adverse action was taken against [her] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by [her] protected conduct." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 539 (6th Cir. 2012) (quoting *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 723 (6th Cir. 2010)). Determining whether a public employee's speech occurred in her capacity as a private citizen is a question of law. *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463 (6th Cir. 2017). We have consistently declined to treat this issue as a mixed question of law and fact as some of our sister circuits do. *Id.* at 463–64 (collecting cases).

We begin with whether Henderson engaged in constitutionally protected conduct. The Supreme Court has held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the

Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). If Henderson was not "speak[ing] as a 'citizen,'" she did not engage in constitutionally protected speech. *See Handy-Clay*, 695 F.3d at 540. In other words, to prevail on her First Amendment claim, Henderson must demonstrate that her communication with Chubb did not occur as part of her official duties.

Defendants point us first to Henderson's job description. A public employee's job description, though an important consideration, is not dispositive of an employee's duties:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424–25. Putting too much emphasis on a job description risks allowing employers to "restrict employees' rights by creating excessively broad job descriptions." *Id.* at 424. Our precedent advises that the exception for employee speech "must be read narrowly as speech that an employee made in furtherance of the ordinary responsibilities of his employment." *Boulton v. Swanson*, 795 F.3d 526, 534 (6th Cir. 2015). On the other hand, speech made "pursuant to *ad hoc* or *de facto* duties not appearing in any written job description is nevertheless not protected if it 'owes its existence to [the speaker's] professional responsibilities.'" *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 348 (6th Cir. 2010) (alteration in original) (quoting *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 544 (6th Cir. 2007)).

In this case, Henderson's job description contains some responsibilities that arguably include reporting unlawful or unethical behavior. For example, Henderson was responsible for "following financial best practices" and "overseeing the day-to-day operations of the City." (R. 29-7, PageID 342) More generally, Henderson was charged with overseeing the financial

management of Flint, which included numerous reporting responsibilities. (R. 29-7, PageID 343–45) Defendants emphasize that Henderson was required to "[e]nsure that the City is in full compliance with Public Act 436,[3] all Emergency Manager Orders, local ordinances, and applicable state and federal law." (R. 29-7, PageID 343) Henderson's employment contract stipulated that even "negligent misapplication or misuse" of public funds, "direct or indirect," was grounds for termination. **(**R. 29-2, PageID 284) These provisions are suggestive of duties that might include ensuring that donations be appropriately routed according to City policy. But in the absence of any express investigative or watchdog duties, we decline to conclude that these general statements are alone sufficient to demonstrate that Henderson's report to Chubb necessarily occurred within her official duties.

While job descriptions may be informative, "[t]he proper inquiry is a practical one." *Garcetti*, 547 U.S. at 424. The "critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Mayhew*, 856 F.3d at 463 (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2379 (2014)). In *Handy-Clay*, we identified several factors to consider in determining whether a public employee is speaking as a citizen, "including 'the impetus for her speech, the setting of her speech, the speech's audience, and its general subject matter.'" 695 F.3d at 540 (quoting *Weisbarth*, 499 F.3d at 546). "[W]hether the speech was made inside or outside of the workplace and whether it concerned the subject-matter of the speaker's employment" are relevant considerations but are not dispositive. *Id.* at 540–41.

The impetus for Henderson's speech was Murray's report about the management of funds. Murray, a Flint employee, approached Henderson because she was worried that failing to direct

---

[3] 2012 Mich. Pub. Acts 436 (codified at Mich. Comp. Laws §§ 141.1541–.1575), amended Michigan's emergency management statute.

donors to the Safe Homes/Safe Water Fund would undermine Flint's established policy priority. Although Henderson testified that she "just tried to soothe [Murray] because [she] considered [Murray] a friend," (R. 33-11, PageID 837), Henderson does not argue on appeal that Murray approached her due to a personal relationship. Indeed, the record does not support the contention that the two were close friends. When Murray was asked how she knew Henderson, Murray responded, "She worked as city administrator." (R. 33-8, PageID 762) Murray clarified that she did some "clerical-type things" for Henderson, like scheduling appointments, but she did not describe any personal relationship with Henderson. (R. 33-8, PageID 762) Henderson herself testified that Murray called her "Ms. Henderson" and not her given name while describing the potential mismanagement of funds. (R. 33-11, PageID 836)

The setting of both the conversation with Murray and the subsequent email to Chubb was City Hall. Henderson composed her email to Chubb from her Flint email account. The sole recipient of Henderson's speech was Chubb, who was contacted in his official capacity as the City's Interim Chief Legal Officer. The audience of Henderson's speech was thus limited to a fellow Flint employee selected based on his official role and duties. And perhaps most importantly, Henderson appears to have been directing that Chubb initiate an official investigation: "As you are Chief Legal Counsel, please promptly initiate an investigation of this matter in your capacity [sic]. In the meantime, please advise appropriate actions I can take to protect employees from potential retaliation resulting from them reporting allegations such as this." (R. 33-29, PageID 964)

The *Handy-Clay* factors weigh in favor of concluding that Henderson's report to Chubb occurred in her official capacity. Henderson may not have been expressly charged with ferreting out financial mismanagement, but when the issue arose, Henderson's response bore all the markers

of official action. She was able to request that Chubb initiate an investigation due to her position as City Administrator. In this instance, Henderson's report "owe[d] its existence to [her] professional responsibilities," *Weisbarth*, 499 F.3d at 544 (second alteration in original) (quoting *Garcetti*, 547 U.S. at 421), including those in her job description and those she undertook "pursuant to *ad hoc* or *de facto* duties not appearing in any written job description," *Fox*, 605 F.3d at 348. Accordingly, Henderson's report to Chubb occurred in her official capacity as City Administrator and was not protected speech under the First Amendment. The grant of summary judgment in favor of the Defendants on this issue was appropriate.

> ### C.    WPA Claim

Henderson's WPA claim is analyzed under a framework similar to that of her First Amendment claim. Henderson must demonstrate that (1) she engaged in a protected activity; (2) she was discharged, threatened, or otherwise discriminated against; and (3) there was a causal connection between Henderson's protected activity and the Defendants' retaliatory action. *Kuhn v. Washtenaw County*, 709 F.3d 612, 629 (6th Cir. 2013); *Wurtz v. Beecher Metro. Dist.*, 848 N.W.2d 121, 125–26 (Mich. 2014). There is, however, one significant difference between the two types of claims. Michigan law contains "no requirement that an employee who reports violations or suspected violations receives the protections of the WPA only if the reporting is outside the employee's job duties." *Brown v. Mayor of Detroit*, 734 N.W.2d 514, 515 (Mich. 2007). Accordingly, unlike her First Amendment claim, Henderson's WPA claim may survive even though her report to Chubb occurred as part of her official duties as City Administrator. We therefore apply the three-element test above, recognizing that there is no dispute as to the second element—that Henderson was discharged.

### 1.    Protected Activity

"The WPA contemplates three types of protected activity: '(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.'" *Kuhn*, 709 F.3d at 629 (quoting *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998)). Defendants argue that Henderson's report was not protected because she has not demonstrated that directing donors from the City-approved Fund to the 527 Organization was a violation of any law. Defendants point to Henderson's deposition testimony and her emails to Chubb, in which she stated that she was not making an allegation of improper conduct and only asked that Chubb investigate the matter. (R. 29-3, PageID 302)

But Henderson was not required to prove that any law was violated. The WPA protects employees who report a violation of the law "or a suspected violation of a law or regulation or rule." M.C.L. § 15.362. Henderson's email to Chubb stated that it was "potentially unethical" to direct individuals trying to donate money for the water crisis to the Mayor's 527 Organization when Flint had already established and approved use of the Safe Water/Safe Homes Fund; the email also explained that Murray had "asked if she would be guilty of a crime" if she directed donors to the 527 Organization. (R. 29-11, PageID 361) Taken in the light most favorable to her, Henderson could have reasonably suspected that a violation of a law, regulation, or rule had occurred based on Flint's endorsement of the Safe Water/Safe Homes Fund and the Mayor's personal intervention to direct funds to her 527 Organization.

### 2.    Causation

The third element of Henderson's WPA claim requires a "causal connection." *Kuhn*, 709 F.3d at 629. Henderson relies on circumstantial evidence to show that she was fired because of her protected activity. "Absent direct evidence of retaliation, a plaintiff must rely on indirect

evidence of his or her employer's unlawful motivations to show that a causal link exists between the whistleblowing act and the employer's adverse employment action." *Debano-Griffin v. Lake County*, 828 N.W.2d 634, 638 (Mich. 2013). Faced with this type of indirect evidence, Michigan courts apply the burden-shifting analysis derived from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521 (Mich. 2001). Under this framework, the plaintiff may "present a rebuttable prima facie case on the basis of proofs from which a factfinder could *infer* that the plaintiff was the victim of unlawful [retaliation]." *Id.* at 520–21 (quoting *DeBrow v. Century 21 Great Lakes, Inc.*, 620 N.W.2d 836, 837 (Mich. 2001)). "Once a plaintiff establishes a prima facie case, 'a presumption of [retaliation] arises' because an employer's adverse action is 'more likely than not based on the consideration of impermissible factors.'" *Debano-Griffin*, 828 N.W.2d at 638–39 (alteration in original) (quoting *Hazle*, 628 N.W.2d at 521). If the plaintiff establishes a prima facie case, "the defendant has the opportunity to articulate a legitimate, non[retaliatory] reason for its employment decision in an effort to rebut the presumption created by the plaintiff's prima facie case." *Hazle*, 628 N.W.2d at 521.

We begin by reviewing the circumstantial evidence to determine whether Henderson has made out a prima facie case of causation. First, Henderson's termination occurred almost immediately—less than three days—after she made the report to Chubb. The temporal proximity between Henderson's report to Chubb and her termination helps to establish an inference of retaliation, but our analysis does not end here. "'Something more than a temporal connection between protected conduct and an adverse employment action is required to show causation' when retaliation is claimed." *Debano-Griffin*, 828 N.W.2d at 639 (quoting *West v. Gen. Motors Corp.*, 665 N.W.2d 473 (Mich. 2003)).

For the requisite "something more," Henderson offers the precipitous decline in her relationship with Weaver. Less than a month prior to her termination, Mayor Weaver nominated Henderson to serve on the Flint Water Interagency Coordinating Committee, a state task force focusing on addressing Flint's water crisis in the long term. (R. 33-16, PageID 881–82) Henderson also testified that when she directly inquired in January 2016 if the Mayor intended to keep her on as City Administrator after the Mayor's authority was restored, the Mayor responded that she wished for Henderson to continue serving in that role. (R. 33-13, PageID 857) A factfinder could reasonably infer from these facts that Henderson and Weaver maintained a productive working relationship until Henderson made her protected report to Chubb. Henderson therefore has established a prima facie case of retaliation under the WPA.

The establishment of a prima facie case gives rise to a presumption of retaliation. *Id.* at 638–39. The burden shifts to the Defendants to provide a legitimate, nonretaliatory reason for the adverse action. *Hazle*, 628 N.W.2d at 521. Defendants offer two such reasons: first, the Mayor had long wished to have her "own team" and had previously requested the resignation of all City Department heads, (R. 29-4, PageID 305–11; R. 33-10, PageID 782), and second, Henderson failed to inform the Mayor promptly of the nature and scope of the Legionnaires' Disease outbreak. Defendants also argue that the Mayor did not know about Henderson's report and so could not have fired her because of it. Both Chubb and Weaver testified that Chubb did not tell Weaver about Henderson's report until approximately two weeks after Henderson was fired. (R. 33-5, PageID 730; R. 29-5, PageID 322)

The Defendants' stated nonretaliatory reasons for terminating Henderson shift the burden back to Henderson. Under Michigan law, "defendants may rebut the presumption of retaliation and, thus, are entitled to summary disposition if they offer a legitimate justification for the

elimination of plaintiff's position unless plaintiff can show that defendants' justification was a pretext for unlawful retaliation." *Debano-Griffin*, 828 N.W.2d at 640. A plaintiff

> can establish that a defendant's stated legitimate, non[retaliatory] reasons are pretextual: (1) by showing the reasons had no basis in fact, (2) if they have a basis in fact, by showing that they were not the actual factors motivating the decision, or (3) if they were factors, by showing that they were jointly insufficient to justify the decision.

*Dubey v. Stroh Brewery Co.*, 462 N.W.2d 758, 760 (Mich. Ct. App. 1990) (citing *Chappell v. GTE Prods. Corp*, 803 F.2d 261, 266 (6th Cir. 1986)).

Henderson pursues the first and second theories. First, she argues that both of the reasons proffered at her termination—that Weaver wanted her own team and that Henderson failed to inform Weaver of the Legionnaires' Disease outbreak—have no basis in fact. Henderson challenges Defendants' claim that she was terminated so Weaver could put her own team in place by showing that she maintained a positive working relationship with Weaver up until she made the report to Chubb. As to the failure to inform Weaver of the Legionaires' Disease outbreak, Henderson testified that she informed the Mayor of the outbreak at two dinner meetings prior to Weaver's election. Henderson also references two emails she sent to the Mayor in January 2016 about the outbreak; she claims these emails demonstrate that she was updating the Mayor about the outbreak that they had previously discussed. Henderson's proffered evidence creates an inference that the Defendants' nonretaliatory reasons for terminating Henderson have no basis in fact and reveals the existence of disputes of material fact.

As to Weaver's knowledge of Henderson's report, Henderson argues that there exist disputes of material fact about when Chubb informed Weaver. The only evidence supporting Chubb and Weaver's timeline is their own testimony—testimony that, according to Henderson, is unreliable. Henderson argues Chubb had the motivation to lie about whether he informed the

Mayor at first because he hoped for a permanent appointment as Chief Legal Officer and later because he wanted leverage in settlement negotiations. Chubb testified that he asked the Mayor to appoint him to the permanent post, explaining that he "had shown [his] support for her and that [he] thought it was time that happened." (R. 33-5, PageID 725) Chubb initially laid out his timeline during an interview that occurred after Chubb learned that he had not been selected for the position, but less than a week before he settled his own employment suit against Flint for $56,000. When Chubb was deposed approximately six months later, he could not remember the date on which he had spoken to the Mayor about the report, but he was sure the conversation had occurred after Henderson's termination. (R. 33-5, PageID 730)

Although Henderson has offered no evidence conclusively establishing that Chubb lied, this is not the type of circumstance in which we would expect such evidence to be readily available. The proffered evidence does permit an inference that Chubb's testimony was swayed by his bias or motive. That Chubb's testimony remained consistent after all negotiations were concluded does not necessarily refute that inference; Chubb's consistency may prove only that he did not want to be caught in a lie. And as we have noted, "questioning of bias or motive should be a matter for cross-examination, not summary judgment." *Johnson v. Washington Cty. Career Ctr.*, 470 F. App'x 433, 438 (6th Cir. 2012). Furthermore, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255.

Henderson has mustered sufficient circumstantial evidence of a retaliatory motive to prevent summary judgment. Taken in a light most favorable to Henderson, the temporal proximity of her report and termination, the possibly pretextual nature of the stated reasons for her

termination, and the questions regarding Chubb's motivations to tell Weaver of the report create triable issues of fact appropriate for resolution by a jury. Summary judgment as to the WPA claim was not appropriate.

### III. CONCLUSION

We **AFFIRM** the grant of summary judgment in favor of Defendants on the First Amendment claim. On the WPA claim, we **REVERSE** the grant of summary judgment in favor of the Defendants and **REMAND** the case for further proceedings consistent with this opinion.

**CLAY, Circuit Judge, concurring in part and dissenting in part.** I agree with the lead opinion that City Administrator Natasha Henderson's Whistleblower claim should have gone to a jury. It is true that Henderson lacked direct evidence that Mayor Karen Weaver knew about Henderson's communications with Interim Chief Legal Officer Anthony Chubb prior to the termination of Henderson's employment. Nonetheless, the lead opinion correctly determines that Henderson had strong circumstantial evidence.

First, the timing of Henderson's termination was suspicious. Henderson was fired three days after she emailed Chubb about the Mayor, and immediately after the Mayor personally met with Chubb. Although two other department heads were also terminated that day, the Mayor's office publicly announced those terminations in a press release that morning. (R. 33-19, press release.) Henderson's termination was not mentioned, suggesting it was not planned to coincide with the other terminations.

Second, the reasons given for Henderson's termination do not inspire confidence in their truth. According to Henderson, the Mayor said that Henderson was terminated because the State would no longer pay Henderson's salary, she had failed to communicate information to the Mayor about the Legionella outbreak, and her job performance had been poor. These explanations are puzzling if we accept Henderson's testimony that she was paid by the City (and not the State, as claimed by the Mayor), (*see* R. 33-13, Henderson affidavit, PageID# 861), that she personally spoke with the Mayor about the Legionella outbreak at least twice, (*see* R. 29-3, Henderson testimony, PageID# 292), and that, by all accounts, the Mayor had approved of her job performance before abruptly terminating her.

Third, Chubb had good reason to protect the Mayor, and therefore to tell the Mayor about Henderson's concerns. By his own admission, Chubb hoped the Mayor would make him the City's

permanent Chief Legal Officer.  Indeed, after Henderson was fired, Chubb highlighted his loyalty to the Mayor, telling her he deserved the Chief Legal Officer position because he had "shown [his] support for her."  (R. 33-5, Chubb dep., PageID# 725.)  This provides reason to doubt Chubb's contention—that he did not tell the Mayor about Henderson's complaints until after she was fired.

Given this evidence, the lead opinion correctly concludes that, with all the smoke surrounding Henderson's termination, a juror could infer fire.  Henderson did much more than provide mere "flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from [personal] experience."  *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (alteration in original) (quoting *Visser v. Packer Eng'g Assocs. Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc)).  Henderson marshalled compelling circumstantial evidence.

However, I part ways with the lead opinion's analysis of Henderson's First Amendment claim.  In my view, that claim also should have gone to a jury.  Because the majority holds otherwise, I respectfully dissent from that portion (Part II.B) of the opinion.

As noted above, Henderson was fired after reporting potentially illegal or unethical conduct by Mayor Karen Weaver.  According to Henderson, the Mayor directed that private donations for the benefit of the City be funneled to an organization she had formed under 26 U.S.C. § 527, rather than to the City's approved nonprofit fund.  Henderson was not responsible for managing or overseeing either fund and she had no apparent expertise in identifying financial improprieties.  Nor did Henderson supervise or report to the recipient of her complaints—Interim Chief Legal Officer Chubb.  In short, Henderson made the eminently reasonable decision to notify the City's Legal Department about her concerns involving the Mayor and request an investigation.  Any Flint resident might have done the same.

As the majority recognizes, Henderson's communications to Chubb were likely protected by the First Amendment if they were exercised in her capacity as a concerned citizen, rather than in her capacity as City Administrator. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). When determining whether an individual's speech was exercised in connection with her public employment or in her capacity as a private citizen, we must engage in a "practical" inquiry that asks "whether the speech at issue is itself ordinarily within the scope of the employee's duties[.]" *Mayhew v. Town of Smyrna*, 856 F.3d 456, 463–64 (6th Cir. 2017) (citations omitted).

In the instant case, we can begin by examining the specific responsibilities assigned to the City Administrator. By order of the Emergency Manager, Flint's City Administrator was the "sole authority concerning modifications to compensation, including appointed officers and other City employees." (R. 29-7, Emergency Manager Order, PageID# 342.) The City Administrator would "[n]egotiate and recommend approval" of collective bargaining agreements; "[s]ubmit regular reports . . . regarding the overall operation and direction of the City"; and "[s]erve as the official City representative to the [Receivership Transition Advisory] Board on behalf of the Mayor and the City Council." (*Id.* at 343.) In addition, the City Administrator would provide the Mayor and City Council with "monthly budget-to-actual reports, balance sheets, and a cash balances report" while "overseeing the day-to-day operations of the City." (*Id.* at 342, 344.)

None of these specific job responsibilities suggests that the City Administrator was responsible for investigating or reporting misconduct by elected officials. In addition, there were no policies or procedures in place to discipline Henderson for failing to report such misconduct, implying that this type of reporting was not required. Instead, Henderson's job responsibilities reveal that she was tasked with overseeing the financial management of the City in a few clearly defined areas. She echoed this sentiment at her deposition, explaining that she felt "personally"

but not professionally obligated to report misconduct. (R. 33-11, Henderson deposition, PageID# 839.) Perhaps recognizing that Henderson's job responsibilities were relatively circumscribed, Defendants presented a different argument in the district court: that Henderson was obliged to report misconduct based on city policies applicable to *all City of Flint employees*. But this argument collapses under its own weight. It cannot be the case that every Flint employee's ordinary responsibilities include reporting employee misconduct; not every Flint employee is a prosecutor, policeman, human resources officer, or City disciplinarian.

The majority notes that the City Administrator was supposed to ensure "financial best practices" and "full compliance" with all applicable laws. According to the majority, these general statements arguably cover reporting unlawful or unethical behavior. The contention is not persuasive. Such vague and ambiguous statements provide little information about Henderson's typical duties. Certainly, they do not imply that Henderson was supposed to report misconduct by those she did not supervise, in areas outside her professional expertise. In any event, general references to ensuring "full compliance" with the law carry less weight than Henderson's specific job responsibilities, which, as discussed above, provide no indication that she was supposed to broadcast her concerns of suspected wrongdoing. We should be mindful of the Supreme Court's warning against reading job descriptions broadly. *See Garcetti*, 547 U.S. at 424 ("We reject . . . the suggestion that employers can restrict employees' rights by creating excessively broad job descriptions.").

In addition, the majority places significant weight on the setting of the dispute (City Hall) and the recipient of the speech (Chubb, a City employee). But given the circumstances, such considerations are not particularly revealing. Henderson learned of the Mayor's actions through a conversation with the Mayor's assistant, Maxine Murray. However, Murray was simply a "friend"

who bumped into Henderson in the supply room, crying about possibly "going to jail" for helping divert funds to the Mayor's § 527 organization. (R. 33-11, Henderson deposition, PageID# 836–37.) Henderson responded as any friend would: she listened and "tried to soothe [Murray]."[1] (*Id.* at 837.) She was not Murray's supervisor, she was in no way "up the chain of command," *see Handy-Clay v. City of Memphis*, 695 F.3d 531, 540 (6th Cir. 2012), and she was not responsible for the money in question. Indeed, if reporting misconduct by public officials had been a routine part of her job, Henderson likely would have been more effective at triggering an investigation. As it stands, she forwarded her complaints to Chubb, who soon replied that his entire Department might be barred by conflict-of-interest rules from taking any action. (R. 29-11, Chubb email, PageID# 366.) There is also no indication in the record below that Chubb took any action to forward the complaint to an appropriate decision-maker within the City, suggesting that he may not have had any official responsibility with regard to such complaints.

Similarly, the fact that Henderson emailed Chubb from her work computer says little about the nature of her communication. As the Supreme Court has explained, a person's decision to "express[] his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work." *Garcetti*, 547 U.S. at 420. In the instant case, Chubb did not report to Henderson, nor did she report to him. They simply both worked for the City. In addition, Henderson explained that her "personal ethics" triggered her decision to notify Chubb of the Mayor's actions. (*See* R. 33-11, Henderson deposition, PageID# 839.) She did not feel professionally obligated to do so. Together, these factors strongly suggest that, when Henderson communicated with Chubb, she was acting "as a

---

[1] The lead opinion goes out of its way to make a number of factual assertions on which it bases its argument in an attempt to substantiate its conclusion that Henderson and Murray were not "personal" friends; however, the nature and extent of the relationship between Henderson and Murray would have been best determined by the fact-finder rather than pursuant to a motion for summary judgment.

concerned citizen addressing an issue of public corruption," *see Handy-Clay*, 695 F.3d at 543, not as a public official.

For all these reasons, I do not believe that Henderson's "ordinary responsibilities" were as wide-ranging as Defendants suggest. To the contrary, it would seem that Henderson's complaints were "extraordinary rather than everyday communication," thereby triggering First Amendment protections. *See id*. at 542 (quoting *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 768 (6th Cir. 2010)). Therefore, in my view, only a single question remains: what motivated the Mayor's decision to fire Henderson? The jury should provide the answer, as it would when examining this question in the context of Henderson's Whistleblower claim. Because the majority concludes that summary judgment was properly granted in Defendants' favor on Henderson's First Amendment claim, I respectfully dissent as to this issue.

**LARSEN, Circuit Judge, concurring in the judgment in part and dissenting in part.**

Henderson claims she was fired because of her speech, which was protected by both the Michigan Whistleblower Protection Act (WPA) and the First Amendment. Causation is an element common to both claims. *See West v. Gen. Motors Corp.*, 665 N.W.2d 468, 471–72 (Mich. 2003) (per curiam); *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). Yet Henderson has produced no evidence, direct or circumstantial, showing that Mayor Weaver knew, before Henderson's termination, that Henderson had reported her alleged wrongdoing to Anthony Chubb, the City's Interim Chief Legal Officer. There being no proof of a causal relationship between Henderson's speech and her termination, I would affirm the district court's grant of the defendants' motion for summary judgment as to both claims.[1]

I.

On February 9, 2016, Henderson received an email from a reporter with MLive Media Group, warning her that she was the subject of a pending news story and asking for a comment. The story ran later that day. The article concerned a potential connection between a Legionnaires' disease outbreak and the Flint River water and described email correspondence between several state and local officials, including Henderson, which indicated that the officials knew of the potential connection approximately ten months before it was shared with the public. Mayor Weaver stated in her deposition that she saw the article while traveling and decided to confront Henderson and fire her if Henderson could not satisfactorily explain the allegations in the article.

Henderson claims that, on that same day, Mayor Weaver's assistant, Maxine Murray, came to her concerned about the handling of donations the mayor's office had received to assist with the

---

[1] Because I conclude that Henderson's claims fail on the causation element, I do not reach the question whether she engaged in protected speech under the First Amendment.

Flint water crisis.[2]  Murray expressed concern over Mayor Weaver's instruction to direct such donations into a fund set up by the mayor, instead of to the city-approved Safe Water/Safe Homes fund.  According to Henderson, Murray was in tears and feared she would go to jail if she followed the mayor's direction.  Concerned that Mayor Weaver was acting inappropriately, Henderson reported this conversation to Chubb, first in person and then in two emails.[3]

On February 12, 2016, Henderson was called to Mayor Weaver's office, where the mayor, Chubb, and the Interim Human Resources Director were gathered; Mayor Weaver fired Henderson.  Why the mayor fired Henderson is the subject of this litigation.

II.

Henderson claims she was fired because she reported the mayor's alleged financial misconduct to Chubb.  To show a causal connection, Henderson had to provide evidence from which a jury could conclude that Mayor Weaver knew of Henderson's report before firing her—for if Mayor Weaver did not know of the report, then she could not have fired Henderson because of it.  Henderson argues that Chubb told Mayor Weaver of the report before she was fired.[4]  Only speculation supports this claim, however.  Henderson needs evidence.  *See Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) ("Mulhall offers only conspiratorial theories, not the specific facts required under the Federal Rule of Civil Procedure 56.  *Cf. Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) (en banc) (holding that summary judgment was appropriate where the inferences plaintiff sought to draw from evidence were akin to 'flights of fancy,

---

[2] Murray denies that this occurred, but we consider the evidence in a light most favorable to Henderson.

[3] Henderson also spoke with Chief Financial Officer, Jody Lundquist, about her concern and her intention to report to Chubb.  Lundquist testified that she did not tell the mayor about Henderson's report, and Henderson does not argue that there is any evidence to dispute this testimony.  Lundquist also testified that Maxine Murray had a similar conversation with her after Henderson was terminated.

[4] It is undisputed that Henderson did not herself tell the mayor of her report.

speculations, hunches, intuitions, or rumors about matters remote from [personal] experience')." (alteration in original)).

*Direct Evidence*. All the direct evidence is that Chubb did not tell Weaver of Henderson's report until after Henderson was fired. Chubb so testified, as did Weaver. Chubb explained that he did not immediately tell Weaver of Henderson's report because he was concerned about a conflict of interest. He, therefore, had his staff reach out to ethics counsel at the State Bar of Michigan, who advised that he should not investigate the matter. Chubb claimed that he eventually told Mayor Weaver of Henderson's report, but only after Henderson was fired, on February 24 or 25. Mayor Weaver provided a similar timeline in her deposition.

That Chubb and Weaver both disclaim communicating about Henderson's allegations before she was fired does not, of course, end the matter. Either Chubb or Weaver could have lied about or misremembered the timing of Chubb's report to Weaver. Henderson is entitled to present her case to a jury if she can produce evidence from which a reasonable jury could conclude that that either is true.

*Chubb's Motive to Lie.* Weaver's motive to lie needs no exploration—if she did not know of the report before the firing, the lawsuit against her cannot proceed. But why would Chubb lie?

Henderson argues that Chubb had reason to tell Mayor Weaver of Henderson's report before the firing because he was trying to demonstrate loyalty to Weaver. At the time of Henderson's termination, Chubb wanted the permanent job of Chief Legal Officer; and after Henderson's termination, Chubb asked for the job, telling Mayor Weaver that "[he] had shown [his] support for her and that [he] thought it was time that that happened." But even if Chubb might have wanted to ingratiate himself to Weaver by immediately informing her of Henderson's

allegations, Chubb repeatedly denied doing so. And by the time he made these denials, any motive he might have had to lie had vanished.

Chubb gave his first statement during an investigation into Henderson's report.[5] By that time, he had already been passed over for the job he wanted. Having been spurned by Weaver's administration, and undisputedly "upset" about it, there is no reason to suspect him of lying to seek Weaver's favor. Henderson maintains, nonetheless, that Chubb likely lied because, at the time of that investigation, Chubb was in the midst of settlement negotiations with the City of Flint.[6] It is sheer speculation, however, that some hope of an increased settlement of his claims against the City would cause Chubb to lie about when he told Mayor Weaver of Henderson's report. As the district court explained, "[a] plaintiff has to offer more than conspiratorial theories or speculation in order to rebut a decisionmaker's disavowal of knowledge."

Chubb again denied telling Mayor Weaver of Henderson's report before her firing in his deposition—which occurred six months after he had settled his claim against the City. Chubb had no reason to lie to protect Weaver or curry her favor, and yet he reiterated that he did not tell the mayor of the report before Henderson was fired. As the district court concluded, "given that Chubb did not get the position he wanted, was upset about it, and left employment with the City and had been pursuing his own claims against Weaver"—claims that he had settled before his deposition— "his alleged motive to lie (i.e., to garner favor with Weaver and get the position) is gone. Yet Chubb still maintains that he did not tell Weaver about the complaint before Henderson's

---

[5] After the State Bar of Michigan advised that Chubb should not himself investigate Henderson's claims, the City hired a private attorney to do so.

[6] Chubb brought his own claim against the City, claiming that he had not been selected for the Chief Legal Officer position in retaliation for his telling the mayor that she had violated city ordinances by allowing another attorney to make decisions on behalf of the legal department as to "the oversight of the litigation surrounding the water quality lawsuits and the determination as to which firm would oversee that litigation." Chubb settled his claim against the City for $56,000 in June 2016.

termination." Henderson has not provided any evidence from which a jury could infer that Chubb lied when he testified that he did not tell the mayor about Henderson's report until after she was fired.[7]

*Timing.* Henderson next argues that the fact that she was fired only three days after she reported her suspicions to Chubb is "strong evidence of a causal connection." But, as the majority agrees, "[s]ubstantial case law from this circuit cautions about the permissibility of drawing an inference of causation from temporal proximity alone." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010) (collecting cases). Instead, "our case law can fairly be characterized as recognizing the possibility that, on a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive, but also recognizing that often evidence in addition to temporal proximity is required to permit the inference." *Id.* at 401 (citations omitted); *see also Debano-Griffin v. Lake County*, 828 N.W.2d 634, 639–40 (Mich. 2013). Moreover, neither case that Henderson cites for her temporal-proximity argument supports the proposition that temporal proximity between the allegedly protected *activity* and termination is sufficient; rather, they support, at most, the proposition that temporal proximity between an *employer learning of the activity* and termination is sufficient in rare cases. *See Asmo v. Keane, Inc.*, 471 F.3d 588, 593 (6th Cir. 2006) ("Asmo met the nexus requirement in part by establishing temporal proximity between Keane's learning of her pregnancy and her termination."); *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) ("In those limited number of cases—

---

[7] Henderson quibbles with Chubb's claim that he did not tell the mayor about Henderson's report until February 24 or 25, pointing to the following post-termination events: (1) the day after the termination, Chubb acknowledged that Henderson had hired an attorney; (2) he and Mayor Weaver had a meeting on February 16 to discuss "Natasha Henderson"; and (3) when Chubb received a February 19 email from Henderson's attorney inviting the City to settle Henderson's claims, he agreed to attempt to negotiate a settlement agreement on February 22. None of this gives rise to an inference that Chubb told Mayor Weaver of Henderson's report *prior* to Henderson's termination on February 12.

like the one at bar—where an employer fires an employee immediately after learning of a protected activity, we can infer a causal connection between the two actions, even if Mickey had not presented other evidence of retaliation." (citation omitted)). The fact that three days passed between Henderson informing Chubb of Weaver's alleged wrongdoing and Henderson's firing cannot establish the essential link—that Mayor Weaver *knew* that Henderson had made the report. *See Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 628–29 (6th Cir. 2008) ("It is not sufficient for the party opposing summary judgment to present a 'mere scintilla' of evidence; the evidence must be such that a reasonable jury could find in her favor." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986))).

*Meeting Right Before Her Termination.* Next, Henderson argues that Chubb must have told Mayor Weaver of her report at a meeting that occurred right before her termination, attended by the mayor, Chubb, and the Interim Human Resources Director, Charlie McClendon. But it is pure speculation that Chubb told Weaver of Henderson's report during this meeting. Both Chubb and Mayor Weaver deny that he told the mayor of Henderson's report before Henderson was terminated. And Henderson has not provided any testimony from the other attendee, McClendon. The mere fact that three people met before Henderson was fired does not support an inference that two of those people must have discussed a report.

Henderson claims that the fact that her firing was not announced in the same press release as the terminations of the Chief of Police and the Fire Chief supports the inference that Chubb must have informed Mayor Weaver of Henderson's report at this meeting. Henderson's argument appears to be that because her termination was not included in the press release, which went out before the meeting, Mayor Weaver must not have planned to fire her when the meeting began; she must have decided to fire her only when she learned that Henderson had made the report, and that

must have occurred at the meeting. Nothing but speculation supports that case. One might as easily speculate that Henderson's termination was not announced in the earlier press release because Henderson herself had not yet been informed that she was being fired or because the Mayor's office for some reason thought it advantageous to announce the firings at separate times to control the news cycle. Henderson has provided no evidence, direct or circumstantial, that Chubb told Mayor Weaver of Henderson's report during this meeting that occurred right before she was fired.

*Reasons for Termination.* Finally, Henderson argues that a jury could conclude that Mayor Weaver must have known of her report because she gave changing and false reasons for firing Henderson. According to Henderson, Mayor Weaver first explained Henderson's termination by claiming that the State could no longer pay Henderson's salary but offered another explanation when Henderson rebutted that the City paid her salary, not the State. But a jury could not conclude that Mayor Weaver must have known of Henderson's report merely because she began the termination meeting by saying that the State would not pay Henderson's salary.

Mayor Weaver gave a second reason for terminating Henderson: that Henderson had not told the mayor about her knowledge of the potential connection of the Legionnaires' disease outbreak and the Flint River water. The mayor testified that, when she had seen the MLive article stating that Henderson was included on an email warning of the potential connection, she had decided to confront Henderson. Henderson, however, claims that she had spoken with the mayor before the election about how "Genesee County had said that [there were cases of Legionnaires' disease that were] possibly linked to the water." Henderson also cites two emails that she had sent to the mayor, one that noted that there had been eighty-seven cases of Legionnaires' disease with ten fatalities since June 2014, and one that describes the causes and transmission of the disease.

Neither email indicates any connection between the disease and the city's use of the Flint River water. From this, Henderson argues that Mayor Weaver lied when she stated that "the last straw" was when she "found out that [Henderson] had known about the Legionnaires' or Legionella and had not shared that information with" the mayor; and, therefore, Henderson claims, a reasonable jury could conclude that Mayor Weaver must have actually fired Henderson because of her report to Chubb. But Henderson has shown, at most, that Mayor Weaver was disingenuous in trying to separate herself from Henderson's knowledge of the Flint water crisis. A reasonable jury could not consider this evidence and conclude that Mayor Weaver must have known of Henderson's report to Chubb. Henderson has not provided evidence that Mayor Weaver lied about the MLive article being a reason for terminating Henderson.

Finally, Henderson disputes Mayor Weaver's claim that part of the reason for terminating Henderson was the Mayor's desire to have her own team in place. Since taking office in November 2015, Mayor Weaver had expressed a desire to have her own team in place; but the emergency manager law prevented her from terminating existing department heads. Weaver had asked Henderson to request the resignation of all department heads, but Henderson refused. Henderson ignores this fact, arguing that the mayor's claim that she wanted her own team in place "lacks credibility," citing in support: (1) Mayor Weaver's appointing Henderson to a new Flint Water Interagency Coordinating Committee on January 25, 2016, (2) Mayor Weaver's declining Henderson's offer to resign in early January 2016, shortly before Mayor Weaver's ability to terminate personnel was restored, and (3) text messages between Mayor Weaver and Henderson that demonstrate that the two communicated about city management. At most, a jury could infer from this that, in January, Mayor Weaver either no longer wanted her own team in place or at that point considered Henderson to be part of her team. But to leap from that to the conclusion that,

therefore, Mayor Weaver had been told that Henderson had reported her suspicion that the mayor was engaged in unethical conduct would not be reasonable. *Liberty Lobby, Inc.*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.").

\* \* \*

Henderson has not produced direct or circumstantial evidence from which a reasonable jury could conclude that Mayor Weaver knew of Henderson's report to Chubb before she terminated Henderson. If she did not know of the report, Mayor Weaver could not have terminated Henderson because of it. Henderson's First Amendment retaliation and WPA claims, therefore, fail as a matter of law. I would hold that the district court properly granted summary judgment to Mayor Weaver and the City of Flint as to both of Henderson's claims. Accordingly, I respectfully join in the judgment in part and dissent in part.