RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0037p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DAVID H. HAYNES,

        *Plaintiff-Appellee,*

    *v.*

CITY OF CIRCLEVILLE, OHIO et al.,

        *Defendants-Appellants.*

No. 06-3070

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 03-01146—Terence P. Kemp, Magistrate Judge.

Argued: December 6, 2006

Decided and Filed: January 25, 2007

Before: BATCHELDER, GILMAN, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** John T. McLandrich, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellants. James R. Kingsley, Circleville, Ohio, for Appellee. **ON BRIEF:** John T. McLandrich, David J. Sipusic, MAZANEC, RASKIN & RYDER, Cleveland, Ohio, for Appellants. James R. Kingsley, Circleville, Ohio, for Appellee.

---

## OPINION

---

    RONALD LEE GILMAN, Circuit Judge. David H. Haynes, a former City of Circleville police officer and handler for the police department's canine unit, filed suit against the City and Police Chief Harold Wayne Gray, Jr. in the Pickaway County (Ohio) Court of Common Pleas. He alleged a violation of Ohio's whistleblower statute, a violation of common law public policy, and retaliatory discharge for exercising his First Amendment rights. Haynes contends that he was fired for protesting proposed cutbacks in canine training. He asserted that this reduction in training was likely to cause an imminent risk of physical harm to the public. The defendants removed the lawsuit to the United States District Court for the Southern District of Ohio, where they subsequently moved for summary judgment on all of the claims against them. Chief Gray also raised the defense of qualified immunity.

    The district court granted the defendants' motion as to Haynes's state-law claims, but denied the motion as to the First Amendment retaliation claim. Chief Gray timely filed an interlocutory appeal for review of the court's decision to deny him the defense of qualified immunity. For the

reasons set forth below, we **REVERSE** the district court's judgment as to Chief Gray and **REMAND** with instructions to dismiss the First Amendment claim as to both defendants.

## I.  BACKGROUND

**A.       Factual background**

In April of 1991, Circleville hired Haynes as a patrolman.  The City authorized the creation of a canine unit in 1996.  Haynes claims that Circleville's decision to do so was based at least in part on research and input from both himself and former Chief of Police John Kinney.  Chief Gray replaced Chief Kinney in January of 1999.  According to Haynes, the canine unit is classified as part of the patrol unit, so Haynes was still considered a patrolman as well as a canine handler from the time the canine unit was created.  Haynes and Circleville entered into a separate employment agreement to cover Haynes's duties as a canine handler.  This agreement was an addendum to the collective bargaining agreement between the Ohio Patrolmen's Benevolent Association and Circleville that covered Haynes's duties as a patrolman.

When the canine unit was created, Haynes was paired with a dog named Bronco for approximately three and a half years.  Haynes worked as a patrol officer for 28 hours per week and spent 12 hours per week training his dog.  The canine training took place at Wachtmeister Canine Training, Ltd. in Dublin, Ohio, and the 12 hours of weekly training generally occurred during the course of one day.  According to Haynes, he and Bronco routinely spent no more than 4 hours of the day in Dublin on actual training.  Haynes occasionally spent more than 12 hours per week at Wachtmeister, including time spent for travel and meals.  He was paid for all of this additional time.

Haynes resigned from the Circleville police force in the fall of 2000 in order to serve a one-year tour of duty in Kosovo as a police monitor with the U.S. State Department.  Upon his return to Ohio in the fall of 2001, Chief Gray rehired Haynes in his former patrol and canine-handler capacities.  Haynes claims that Circleville considered him to be the administrator of the canine program, in addition to being a handler, from October of 2002 through January of 2003.

In February of 2003, Chief Gray instituted a cost-containment measure under which canine handlers and their dogs were allowed to train at Wachtmeister only once every three weeks rather than weekly.  Chief Gray also informed Haynes that the maximum compensation for any training day spent in Dublin would be limited to eight hours, including travel time.

Haynes was upset with this turn of events, prompting him to write a long memo to Chief Gray that expressed his displeasure at the reduction in training.  The February 24, 2003 memo stated in pertinent part as follows:

> Now we are about to change boats mid-stream and I expect that there will be serious negative consequences for doing so.  Words like "deliberate indifference," "negligence" and "failure to train" will someday be brought up with respect to the Circleville Police Department's Canine Program.  My response will be, "I told them so."
> . . .
>
> You know, or should know, that any deviation from the old training regime will probably result in an expensive learning experience.  But I will not be paying the bill.  You have received my last words of caution.  It is all on you now—I hope nothing bad comes of it.  I will train K9 Rex in accordance with this new plan, no overtime on

> Dublin weeks and no more than 2 hours on Circleville weeks—172 hours per year. It will be interesting.
>
> . . .
>
> I guess that despite the fact that I trained the dog; have over 6,000 hours of Canine Training experience, over 15 years of Law Enforcement experience does not warrant a consultation.

Chief Gray responded by letter on February 27, 2003, addressing Haynes's concern about the cutbacks in training in some detail. He offered Haynes the choice of complying with the new training parameters or resigning from his position as a canine handler. Shortly thereafter, a scheduling officer called Haynes on a day when his shift was close to starting and asked him to report for duty and assist with a drug search. Haynes refused to come in. The parties dispute why he refused. Haynes claims that he was feeling the effect of withdrawal from Paxil, a prescription antidepressant medication, and was unfit to come in to work. The officer who called Haynes, on the other hand, said that Haynes flatly refused to come in, without explanation, and told the officer "that's just the way it goes." After Haynes refused to report for work, Chief Gray relieved Haynes of his duties as a canine handler.

Chief Gray subsequently placed Haynes on administrative leave as of March 10, 2003 and ordered a psychological evaluation. The psychological evaluation was scheduled for March 13, 2003. Under Ohio law, "[a]n appointing authority may require that an employee submit to medical or psychological examinations." Ohio Admin. Code 123:1-33-01 (2004). An employee's "refusal to submit to an examination, the unexcused failure to appear for an examination, or the refusal to release the results of an examination amounts to insubordination, punishable by the imposition of discipline up to and including removal." *Id.* Haynes notified Chief Gray that he would not submit to the examination until he had time to seek the advice of his attorney, although he was not "refusing" to participate in the evaluation.

Later in the day on March 10, 2003, officers went to Haynes's house to pick up his canine equipment. Haynes gave the officers a box wrapped in Christmas paper that contained the equipment. Affixed to the box was a Daffy Duck tag addressed to Chief Gray that read "Do not open until Christmas." Haynes described this action as "controlled venting."

## B.    Procedural background

On March 12, 2003, Haynes notified Chief Gray that he was filing a labor grievance with the City and with the Circleville Police Department, claiming that there had been no cause to remove him from his canine-handler duties, to place him on administrative leave, or to order him to submit to a psychological evaluation. The record does not reflect the outcome of this grievance procedure, or whether a formal grievance was even filed.

Chief Gray notified Haynes on March 18, 2003 that Haynes would be subject to a pre-disciplinary hearing on March 24, 2003. The purpose of the hearing was to give Haynes a chance to respond to the following allegations of misconduct: multiple counts of insubordination, neglect of duty, unsatisfactory performance, disrespect, failure to report to duty as required, conduct unbecoming an officer, and sick-leave violations. Haynes's attorney asked for a one-day continuance, which was granted. In the interim, Haynes's attorney proposed a settlement under which Haynes would resign as a canine handler but would retain his job as a patrolman. The attorney's settlement letter stated that "[i]t is unfortunate that what was intended to be a thoughtful, provocative, intelligent exchange of information to work out a training disagreement was perceived and misapprehended to be a 'threat.'" Whether any settlement discussions actually took place is not reflected in the record.

The disciplinary hearing took place as rescheduled on March 25, 2003. Haynes explained that the intent of his February 24, 2003 memo was not to be insubordinate, but to "cover his rear end in court" should there be legal ramifications as a result of the reduced canine training. Haynes and Chief Gray discussed the other allegations in detail, concluding with Chief Gray noting that "the situation we're in has caused a lot [of] turmoil and a lot of problems for our department." Circleville terminated Haynes's employment the next day.

Haynes filed suit in the state Court of Common Pleas against Chief Gray and Circleville in November of 2003, asserting a claim under Ohio Rev. Code Ann. § 4113.52 (Ohio's whistleblower statute), a violation of common law public policy, and a claim for retaliatory discharge based on the exercise of his First Amendment rights. The defendants removed the suit to federal court. They later moved for summary judgment on all claims. Particularly relevant to this appeal, Chief Gray argued that he was entitled to judgment as a matter of law on the ground of qualified immunity. The district court disagreed. Chief Gray timely filed this interlocutory appeal from the denial of qualified immunity.

## II. ANALYSIS

### A.    Standard of review

"A denial of summary judgment is generally not a final judgment." *Hoover v. Radabaugh*, 307 F.3d 460, 465 (6th Cir. 2002). But a denial of summary judgment on the ground of qualified immunity "may be appealed as [a] collateral order[] where (1) the defendant is a public official asserting the defense of qualified immunity, and (2) the issue appealed concerns not which facts the parties might be able to prove, but whether certain alleged facts reflect a violation of clearly established law." *Id.*

We review de novo a district court's denial of summary judgment on the ground of qualified immunity. *Swiecicki v. Delgado*, 463 F.3d 489, 497 (6th Cir. 2006). Application of the qualified-immunity doctrine is a question of law; "to the extent that there is disagreement about the facts, . . . we must review the evidence in the light most favorable to the Plaintiff, taking all inferences in his favor." *Id.* (brackets omitted).

### B.    Qualified immunity

When government officials are performing discretionary functions, their actions are generally shielded from civil liability as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). If a government official is granted qualified immunity, he or she is immune from suit over the asserted claim. *Hoover*, 307 F.3d at 465.

This court typically employs a two-step analysis in determining whether an official is entitled to qualified immunity: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In addition, this court occasionally utilizes a third step: (3) "whether the plaintiff offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights." *Swiecicki*, 463 F.3d at 498. The three-step approach "may in some cases increase the clarity of the proper analysis." *Id.* "If, on the other hand, the case at issue is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable, then this court has collapsed the second and third prongs in an effort to avoid duplicative analysis." *Id.* (brackets and quotation marks omitted).

Once Chief Gray raised the defense of qualified immunity, Haynes bore the burden of demonstrating that Chief Gray was not entitled to it. *See id.* The district court "concluded that, construing the facts in Mr. Haynes' favor, portions of Mr. Haynes' memorandum are protected by the First Amendment and terminating Mr. Haynes for expressing his protected First Amendment rights is violative of the Constitution." Referencing the "extensive jurisprudence" on the First Amendment, the court ruled that "a reasonable official would have recognized both that Mr. Haynes engaged in protected speech and that departmental concerns did not justify retaliatory action based on that speech, either standing alone or as a substantial factor in the adverse job action."

### 1.        *First Amendment violation*

"The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hoover*, 307 F.3d at 466. Haynes alleges that he was terminated in retaliation for exercising his First Amendment rights by speaking out against the reduced canine-training program.

This court has developed a three-step test for analyzing a public employee's claim of First Amendment retaliation. First, Haynes must show that, as a matter of law, the speech at issue was protected. *See Taylor v. Keith*, 338 F.3d 639, 643 (6th Cir. 2003). To do so, he must demonstrate both that the speech "touches on a matter of public concern" and that "his interest in the speech outweighs the government's countervailing interest in promoting the efficiency of the public service it provides as an employer." *Id.* Haynes must next show that his termination by Chief Gray "would chill an ordinary person in the exercise of his First Amendment rights." *Id.* Finally, he "must present sufficient evidence to create a genuine issue as to whether his speech was a substantial or motivating factor in the employer's decision to discipline or dismiss." *Id.*

In May of 2006, the Supreme Court decided *Garcetti v. Ceballos*, 126 S. Ct. 1951 (2006), holding that "when public employees make statements *pursuant to their official duties*, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 1960 (emphasis added). This holding controls the outcome of the present case.

Ceballos, the plaintiff in *Garcetti*, was a deputy district attorney in the Los Angeles County District Attorney's Office. 126 S. Ct. at 1955. At the time of the events giving rise to his complaint, Ceballos was a calendar deputy, which placed him in a supervisory capacity over other deputies. *Id.* A defense attorney informed Ceballos that there were inaccuracies in an affidavit used to obtain a critical search warrant in a case pending against the defense attorney's client. *Id.* Ceballos conducted an investigation, determined that the affidavit indeed contained serious misrepresentations, and wrote a memo to his supervisor recommending dismissal of the case based on the defective affidavit. *Id.* at 1955-56. After Ceballos's supervisors met to discuss the situation, his immediate supervisor continued to prosecute the case. *Id.* at 1956. At a hearing on the defendant's motion to suppress, Ceballos was called by the defense to testify about his concerns regarding the affidavit. *Id.*

Ceballos claimed that, following these events, the District Attorney's Office retaliated against him for speaking out by reassigning him from a calendar-deputy position to a trial-deputy position, transferring him to another courthouse, and denying him a promotion. *Id.* After losing an internal employment grievance, Ceballos sued the District Attorney's Office on a theory of First Amendment retaliation under 42 U.S.C. § 1983.

The Supreme Court began its opinion by discussing the First Amendment analysis set forth in *Pickering v. Board of Education of Township High School District 205, Will County*, 391 U.S. 563 (1968), and *Connick v. Myers*, 461 U.S. 138 (1983), noting that "[this] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment."

126 S. Ct. at 1957. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id*. *Pickering* balancing initially "requires determining whether the employee spoke as a citizen on a matter of public concern." *Id*. at 1958. "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Id*.

When the answer is yes, however, the "question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id*. The Court ultimately rejected Ceballos's claim that his speech was protected by the First Amendment, holding that "[t]he controlling factor in Ceballos' case is that his expressions were made pursuant to his duties as a calendar deputy." *Id*. at 1959-60. It noted that "[t]he fact that his duties sometimes required him to speak or write does not mean that his supervisors were prohibited from evaluating his performance." *Id*. at 1960.

The key issue in the present case, then, is whether or not Haynes's expressions were made pursuant to his duties as a canine handler and patrolman for Circleville. Without the benefit of the Supreme Court's later decision in *Garcetti*, the district court did not focus on this issue. It instead concluded that the interest of Mr. Haynes as a citizen, "in commenting on matters of public concern, outweigh[ed] the interest of the Chief and the City in promoting efficiency of the public service it performs through its employees."

Haynes states that he was involved with the development of the canine program from its inception, and that he had developed the standard operating procedure for the canine unit. This standard operating procedure, according to Haynes, is still in use today. Haynes claims that he was considered the administrator of the program for most of its existence. The thrust of Haynes's memo to Chief Gray was thus his concern over cutbacks in canine training.

Haynes concedes that both the "Christmas present" and the February 24, 2003 memo were in response to Chief Gray's planned changes to the canine-training program. Chief Gray, unhappy with Haynes's behavior and attitude, responded in kind, first by placing Haynes on administrative leave and later taking action that culminated in Haynes's termination. Haynes's own lawyer characterized the dispute as a training disagreement. The proposed cutbacks still undeniably complied with Ohio law. At the end of the February 24 memo, Haynes in fact agreed to follow the new training schedule, commenting that "[i]t will be interesting." The context of the memo as a whole is best characterized as that of a disgruntled employee upset that his professional suggestions were not followed as they had been in the past.

In lodging his protests to Chief Gray against the training cutbacks, Haynes was acting as a public employee carrying out his professional responsibilities. *See Garcetti*, 126 S. Ct. at 1960 ("When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee."). Haynes's speech is therefore unprotected as a matter of law because all of the speech at issue in this case, like the speech at issue in *Garcetti*, was made pursuant to his official duties. *See id*. ("Contrast, for example, the expressions made by the speaker in *Pickering*, whose letter to the newspaper had no official significance and bore similarities to letters submitted by numerous citizens every day.").

As a police officer, Haynes had developed the standard operating procedure for the canine unit and worked with his dog as part of his day-to-day professional activities. His memo to Chief Gray, made pursuant to these professional duties, is not protected under the First Amendment. *See Mills v. City of Evansville*, 452 F.3d 646, 648 (7th Cir. 2006) (holding that a police sergeant's speech was not protected under *Garcetti*, where the sergeant was "on duty, in uniform, and engaged in discussion with her superiors"). The fact that Haynes communicated solely to his superior also indicates that he was speaking "in [his] capacity as a public employee contributing to the formation

and execution of official policy," *see Mills*, 452 F.3d at 646, not as a member of the public writing a letter to the editor as in *Pickering*.

At the time that Haynes sent his memo in February of 2003, he was simply speculating that someday there could be a negative incident that might result from the reduction in canine training. Haynes's memo focused on his discontent with the new program, which he later admitted in his deposition was in compliance with Ohio law. The memo thus reflects nothing more than "the quintessential employee beef: management has acted incompetently." *Barnes v. McDowell*, 848 F.2d 725, 735 (6th Cir. 1988). Haynes's invocation in his memo of legal terms such as "deliberate indifference" and "failure to train" do not, without more, render Haynes's speech a matter of public concern. *See Rahn v. Drake Ctr., Inc.*, 31 F.3d 407, 412-13 (6th Cir. 1994) (holding that the employee's reference to "patient endangerment" in a press release did not make the speech a matter of public concern where the focus of the speech "is on the employees' discontent with new *work* rules which *might* lead to a patient endangerment situation") (emphasis in original).

In short, the district court erred in concluding that Haynes's memo constituted protected speech even under the law of this circuit prior to *Garcetti*. Haynes thus has no First Amendment cause of action even if Chief Gray did fire him as a direct result of either the memo or the ill-fated "Christmas gift."

### 2.   *No violation of a clearly established right*

Because Haynes's speech took place pursuant to his official duties as a police officer, he cannot establish that a constitutional violation took place. *See Garcetti*, 126 S. Ct. at 1961 (concluding that the plaintiff's claim of unconstitutional retaliation failed because the First Amendment "does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities"); *Thomson v. Scheid*, 977 F.2d 1017, 1021 (6th Cir. 1992) (holding that the plaintiff's speech undertaken in the course of acting as a public employee was unprotected). Haynes is *a fortiori* unable to satisfy the second prong of the qualified-immunity analysis—that the constitutional right was clearly established.

## C.   Retaliation claim against Circleville

Our determination that Haynes's memo is not protected speech because it was written pursuant to his official duties as a police officer applies equally to his retaliation claim against the City of Circleville. Haynes's First Amendment claim against the City therefore fails as a matter of law.

## III.  CONCLUSION

For all of the reasons set forth above, we **REVERSE** the judgment of the district court as to Chief Gray and **REMAND** the case with instructions to dismiss the First Amendment claim as to both defendants.