**NOT RECOMMENDED FOR PUBLICATION**

File Name: 20a0505n.06

Case No. 20-3021

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Aug 27, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| GREGG FLEDDERJOHANN, | ) | |
| | ) | |
| *Plaintiff-Appellant*, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| CELINA CITY SCHOOL BOARD OF | ) | OHIO |
| EDUCATION, et al., | ) | |
| | ) | |
| *Defendants-Appellees*. | ) | |
| | ) | |

Before: BOGGS, SUTTON, and WHITE, Circuit Judges.

BOGGS, Circuit Judge.

For twenty-two years, Gregg Fledderjohann was a teacher for the Celina City School District, primarily teaching third grade. But in 2018, the School Board fired Fledderjohann after it determined that he had made false accusations against fellow teachers. Fledderjohann had written an email to the Ohio Department of Education alleging that he had witnessed several acts of dubious propriety in connection with a state-administered exam. The district investigated the allegations, concluded that there had been no cheating, and that Fledderjohann had made up the accusations. After being fired, Fledderjohann sued the School Board, several board members, and the district superintendent, arguing that the district improperly fired him for exercising his First Amendment rights. The district court granted summary judgment to the defendants, and we affirm.

**I**

In November 2016, Celina's third graders took the American Institutes for Research ("AIR") English Language Arts exam, a standardized test that is conducted online. A month later, Fledderjohann called the Ohio Department of Education ("ODE") and was directed to Jennifer Vaughn, Educational Program Specialist at ODE's Office of Curriculum and Assessment. Then, on December 22, 2016, he sent an email to Vaughn. Fledderjohann—without providing his name—introduced himself as "an educator at a public school checking on AIR testing," adding that "[w]ith added pressures on teachers to have students obtain certain levels and scores it seems right for everyone to be on the same page." He then explained that he was "aware" of certain behaviors at his school, including: (1) "administration [sic] signing students back in after students have logged out and are done with the AIR test to have them 'retake' or 'recheck' answers" and "students changing answers because of this"; (2) teachers who said it was "ok to look over a students [sic] test," and that if the student "forgot to do part 'B' or if they left a blank" the teachers would "tell students to go back and complete and recheck answers"; and (3) "teacher/s leaving instructional information on bold big posters 'up' on how to write a paragraph, read, or complete AIR testing related questions." After describing each of these behaviors, Fledderjohann asked whether the conduct was "ok" or "allowed." Fledderjohann then asked "[w]here specifically, if at all does [sic] 'rules' tell or spell out, that an educator should report such breaches and how to report . . . if any as listed above are breaches?" And he also asked if there would be "consequences" for the students, administrators, and teachers who engaged in the described conduct "if the above are

breaches." Fledderjohann asked for the email to be kept anonymous, and he signed it as being from a "concerned educator."

Vaughn emailed a response almost immediately, saying that the described incidents were serious breaches of testing protocols and that they could lead to the tests being invalidated or the teachers involved having their teaching licenses revoked. She explained, "Potential test security violations always start with me." She asked Fledderjohann if he would be comfortable disclosing the names of the teachers involved, and Fledderjohann responded in a December 28 email naming Principal Corey Ahrens, District Curriculum Director Jason Luebke, and fellow third-grade teacher Jenna Hodge as the ones responsible. Specifically, Fledderjohann claimed that Hodge was the one who left "writing prompts up in full view of students" and who "checked all [her] student's [sic] tests" and told them to "change answers"; that Ahrens was the one who "logged students back in after they were done with the test and told them to go over and reread the script and answers"; and that Luebke "was fully aware and present" during these events.

ODE then contacted Celina Superintendent Kenneth Schmiesing and directed him to investigate allegations, described in general terms. Schmiesing made a public-records request to ODE for any relevant documents related to the report of testing violations and thus was able to identify Fledderjohann as the accuser. Schmiesing then interviewed Fledderjohann, Ahrens, Luebke, and Hodge. Schmiesing also interviewed seven teachers identified by Hodge or Fledderjohann as potential witnesses, five staff members who were present on the day of the exam, and five students from Fledderjohann's class. Based on the interviews, Schmiesing drafted a report to ODE concluding that no test violations had occurred. The report noted that none of the individuals interviewed had witnessed any test improprieties on the day of the assessment. It also stated that there were reasons to question Fledderjohann's credibility because he: "(1) failed to

immediately report the alleged violations as required by District protocol; (2) either was unable or unwilling to identify the student who was the basis of his allegations against Mr. Ahrens; (3) either was unable or unwilling to identify witnesses regarding his allegations against Ms. Hodge; and (4) submitted different allegations to ODE than the allegations asserted during his interview, which changed over the course of the interview." Schmiesing submitted the report to ODE on February 27, 2017, and ODE sent Schmiesing a reply on March 15 notifying him that it concurred with the report's conclusion that there were no testing violations and that it was closing its inquiry into the matter.

After wrapping up the ODE-directed investigation, the School Board began termination proceedings against Fledderjohann. On September 18, 2017, the Board adopted a resolution noting its intent to terminate Fledderjohann, and it listed the findings from Schmiesing's report as the basis for its resolution. The resolution noted that Fledderjohann's actions violated several Board policies, including Board Policy 8900, which states that "[t]he Board of Education expects all its employees to be honest and ethical in their conduct and to refrain from engaging in activities which may be fraudulent, illegal, or otherwise unethical," and Board Policy 3210, which required staff to "refrain from knowingly or willfully making false statements about a colleague or the District." The resolution also detailed Fledderjohann's disciplinary history and that he had received two written reprimands in 2016. In response, Fledderjohann requested a hearing before a referee appointed by ODE pursuant to Ohio Revised Code § 3319.16. The referee conducted interviews over a five-day period in December of 2017, where Fledderjohann appeared, was represented by counsel, presented evidence, and cross-examined other witnesses.

The referee issued his report on May 8, 2018, finding that the Board had proved each of the allegations set forth in its resolution by a preponderance of the evidence. The report stated that

"Mr. Fledderjohann made false and intentional misrepresentations to the Ohio Department of Education accusing Mr. Luebke, Ms. Hodge, and Principal Ahrens of Testing Violations," that this was a "serious matter," and that Fledderjohann "did not act in 'good faith.'" Part of the rationale for this conclusion was that "[t]he three staff members who Mr. Fledderjohann reported to Ms. Vaughn had been involved in past disciplinary proceedings against Mr. Fledderjohann" and that Fledderjohann's statements were made "out of retaliation and retribution against them." The report also stated that "[i]f Mr. Fledderjohann believed in good faith the alleged testing violations had occurred . . . he would have at once reported the violation" as he was required to do "pursuant to the training provided to him prior to the administration of the test." The board terminated Fledderjohann on June 18, 2018.

As it turns out, Fledderjohann has a history with Ahrens, Luebke, and Hodge. At the beginning of the 2015–2016 school year, Fledderjohann had met with Ahrens and Luebke over allegations from parents that Fledderjohann had told his third-grade students to keep secrets from their parents. In his deposition, Fledderjohann acknowledged that Ahrens "was the one that originated [the formal reprimand letter], these ideas" and that Luebke was "in the room" when Ahrens confronted Fledderjohann about these allegations. On February 9, 2016, the superintendent issued Fledderjohann a written reprimand for a violation of "Staff Ethics" (Board Policy 3210), after which Fledderjohann was assigned to a position at the high school for the rest of the school year. Fledderjohann returned to teach third grade at the beginning of the 2016–2017 school year, but he was issued another written reprimand on September 8, 2016, for entering Hodge's classroom and accusing her of taking his classroom supplies. The reprimand notes that his conduct and abrasive tone of voice had intimidated her. Fledderjohann later stated that he "never accused [Hodge] of stealing anything" but that she reported him to the superintendent

anyway. Although these prior interactions with Ahrens, Luebke, and Hodge were not expressly mentioned in Schmiesing's report to ODE or in Fledderjohann's termination notice, they were mentioned in the referee's report recommending Fledderjohann's termination.

Fledderjohann filed the instant action under 42 U.S.C. § 1983 on September 27, 2018, claiming that he was fired in retaliation for engaging in protected speech. The district court granted summary judgment for the defendants, and Fledderjohann timely appealed.

## II

### A. Standard of Review

We review the district court's grant of summary judgment de novo. *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999) (en banc). "The party seeking summary judgment has the initial burden of showing that there is no genuine issue as to any material fact, and we will reverse a grant of summary judgment if the nonmoving party has presented evidence of specific facts, which, viewed in the most favorable light, indicates that there is a genuine issue for trial." *Ibid*. At the summary-judgment stage, the reviewing court "considers the facts and any inferences drawn from the facts in the light most favorable to the non-moving party." *Chapman v. UAW Local 1005,* 670 F.3d 677, 680 (6th Cir. 2012) (en banc).

### B. First Amendment Retaliation: An Overview

Fledderjohann has alleged only one claim: a First Amendment retaliation claim. "[T]he First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern," *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006), and "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression," *Connick v. Myers*, 461 U.S. 138, 142 (1983). To establish a First Amendment-retaliation claim, the plaintiff must demonstrate:

> (1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).  The question of whether the plaintiff engaged in constitutionally protected speech itself requires an analysis of three factors:

> First, the employee must speak on "matters of public concern."  Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties.  Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

*Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (citations omitted) (quoting *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337–38 (6th Cir. 2010)).  The determination of whether an employee has engaged in protected speech is one of law.  *Id*. at 464.

The parties primarily dispute whether Fledderjohann's correspondences with ODE were protected speech and, more specifically, whether he spoke as a public employee or a private citizen.  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  *Garcetti*, 547 U.S. at 421.  In *Garcetti,* the plaintiff (Ceballos) was employed as a calendar deputy for the Los Angeles County District Attorney's office.  A defense attorney had asked Ceballos, as part of his duties, to review possible inconsistencies in an affidavit that had been used as the basis for a search warrant.  Ceballos investigated, and wrote a memo to his supervisor detailing his view that the affidavit contained inaccurate information and that it was exculpatory for the defense.  *Id*. at 414.  Despite Ceballos's objections, the District Attorney's office continued to prosecute the case.  *Ibid.*  Ceballos claimed

that in the aftermath of this incident, he was reassigned to a different position, transferred to a different courthouse, and denied a promotion. *Id*. at 415. Ceballos advanced a First Amendment retaliation claim—alleging that he was retaliated against for writing a memo that expressed dissenting views—but the Supreme Court held that the defendants were entitled to summary judgment because Ceballos did not speak as a private citizen. *Id*. at 422. The "controlling factor" was that Ceballos's memo was written "pursuant to his duties as a calendar deputy," and "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*. at 421–22.

The Supreme Court refined its holding from *Garcetti* in *Lane v. Franks*, ruling that "[t]he critical question under *Garcetti* is whether the speech at issue *is itself ordinarily within the scope of an employee's duties*, not whether it merely concerns those duties." 573 U.S. 228, 240 (2014) (emphasis added). "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment." *Id*. at 239. The employee-plaintiff in *Lane* was subpoenaed to testify at a public-corruption trial on information he had learned as a state employee, and he was fired a few months after the trial concluded. *Id*. at 235. Because the employee did not testify "pursuant to [his] 'official responsibilities'" and the testimony merely "concern[ed] information learned during [his] employment," the Court held that he spoke as a private citizen. *Id.* at 238–39.

Thus, determining whether Fledderjohann's statements to ODE were made as an employee or as a citizen requires us to evaluate whether they were made pursuant to his job duties or whether they merely relayed information he learned while on the job in a way that did not affect his duties.

Relevant factors include: "the impetus for [the] speech, the setting of [the] speech, the speech's audience, and its general subject matter." *Weisbarth v. Geauga Park Dist.*, 499 F.3d 538, 546 (6th Cir. 2007). Other factors include: whether the speech was an explicit or implied part of an employee's job description, *see id*. at 544 (noting how "ad hoc or de facto duties can fall within the scope of an employee's official responsibilities despite not appearing in any written job description"); and the motivations behind the speech, *compare Holbrook v. Dumas*, 658 F. App'x 280, 288 (6th Cir. 2016) (holding that the plaintiff spoke as an employee because he was motivated by "employees' right to know about [a] threat to their continued employment" rather than "a citizen's concern about mismanagement in Village government") *with Stinebaugh v. City of Wapakoneta*, 630 F. App'x 522, 527–28 (6th Cir. 2015) (holding that plaintiff spoke as a citizen because "the impetus for Stinebaugh's speech was to voice his opinion about how the City allocated its resources," that he "was off duty, out of uniform and out of the office" when he spoke, and that he "never identified himself as a public employee").

### C. Fledderjohann Spoke as a Public Employee

With these factors in mind, we hold that Fledderjohann has failed to demonstrate a genuine dispute of material fact about whether he spoke as an employee. Fledderjohann's emails to ODE expressed concerns involving his responsibilities as a teacher. He therefore cannot show that his speech was constitutionally protected, and thus the district court did not err in granting summary judgment for the defendants.

Fledderjohann's job description as a third-grade teacher included several "essential functions," among which was "[p]roctor[ing] state/district testing activities as directed" and "[u]phold[ing] mandated security procedures" associated with the testing. Fledderjohann testified at his deposition: "My job as a proctor is to maintain the security in my room and follow what I'm

supposed to do." As part of the teachers' training in preparation for the AIR exam, Fledderjohann also signed an "Annual Notice Regarding Security Provisions for Statewide Assessments and Standards for the Ethical Use of Tests," which outlined a teacher's responsibility to "immediately contact the designated school official and provide him/her with the name(s) of the violator(s) and nature of the alleged violation(s)" if the teacher suspected any "reason to believe that there's been an assessment security violation." These facts demonstrate that enforcing test-security protocols was part of Fledderjohann's duties as a teacher.

An analogous case is *Mayhew v. Town of Smyrna*, in which the plaintiff, who was the lab supervisor of the town's wastewater-treatment plant, initially reported a coworker's misconduct (falsifying data, incomplete testing, etc.) to the plant manager. 856 F.3d at 460. However, after the misbehaving coworker was later promoted, Mayhew escalated his complaints to the town's human-resources department, including sending an email stating that he found "it disturbing that the Town Manager would promote someone" that was putting pressure on plant workers "to hide violations." *Id*. at 461. The town characterized Mayhew as "insubordinate" and as being "bitter against" the coworker and ultimately dismissed him. *Ibid*. We held that Mayhew's complaints about his coworker were made pursuant to his ordinary job responsibilities because he was required to "*report any appropriate situations and accidents immediately to management*." *Id*. at 465. The fact that Mayhew's supervisors ultimately disagreed with the reporting or found it "insubordinate" did not mean that the statements were not made as an employee.

Compare *Mayhew* with *Buddenberg v. Weisdack*, in which we held that a fiscal coordinator for the Geauga County, Ohio, Health District, who was responsible for "processing payroll and accounts payable, preparing fiscal reports, and contributing to the department budget process," was not speaking as an employee when she reported "internal ethical violations [and] allegations

of discrimination to the Board of Health." 939 F.3d 732, 735–36 (6th Cir. 2019). Although the procedural posture of the case was on an appeal from a motion to dismiss, we concluded that because the plaintiff had alleged that her "ordinary duties did not include reporting employee misconduct to the Board," her lawsuit could proceed. *Id*. at 740.

Here, Fledderjohann's ordinary job responsibilities required him to "proctor[] state/district testing activities as directed" and to "[u]phold[] mandated security procedures," and, for the AIR assessment in particular, he was supposed to report any potential testing violations immediately to a "Building Test Coordinator" or a "District Test Coordinator." Thus, any communication reporting possible testing violations was part of Fledderjohann's official duties and, indeed, the defendants note that Fledderjohann was fired not just for making false accusations but also for "fail[ing] to report his allegations of test security violations to a District Test Coordinator, a Building Test Coordinator, or the building principal."

Fledderjohann argues that his case is different. He claims that he was uncomfortable reporting directly up the formal chain of command because two of the officials to whom he was supposed to report—Ahrens and Luebke—were two of the alleged perpetrators. Appellant Br. 23. Ahrens was one of two designated "Building Test Coordinators," and Luebke was the "District Test Coordinator." Appellee Br. 4–5. This created a situation in which—per the testing protocols—he should have reported the violations directly to the violators themselves. Fledderjohann stated during his deposition that this was one reason that he decided to reach out to ODE directly. He insists that a recent case, *Barrow v. City of Hillview*, 775 F. App'x 801 (6th Cir. 2019), supports his claim that reporting misconduct to authorities above one's immediate supervisors means that the individual was not speaking as an employee. In *Barrow*, two police officers who had witnessed an instance of possible corruption (fellow officers moving drug

paraphernalia that was found on the mayor's property to off the property) ultimately reported their concerns to the FBI. *Id*. at 804. We held that the officers' interactions with the FBI were not employee speech because speaking to the FBI was not an expected part of their ordinary job responsibilities. *Id*. at 813. Although the officers' speech "concerned information they learned as police officers, their ordinary job responsibilities did not include reporting allegations of public corruption to outside authorities," and their interactions with the FBI were "distinct from their obligations as Hillview police officers." *Ibid*.

*Barrow* is not analogous to Fledderjohann's situation. ODE is not an "outside authority." *Ibid*. Rather, ODE is *the main authority* concerned with allegations of cheating. It is uncontested that ODE was the state entity that established the protocols related to the AIR test, and Fledderjohann stated that he emailed Vaughn specifically because he believed her to be "the head of test security for the AIR testing." Vaughn confirmed that "[p]otential test security violations always start with [her]." Further, Luebke provided Fledderjohann and other teachers with the "Ohio State Test Fall 2016 Test Administration Manual," which "is the full resource that should have everything or almost everything that teachers need for testing." That manual provided instructions on how to respond to a possible security violation: "Call the Office of Curriculum and Assessment . . . for further guidance if needed. Please identify call as possible security incident." Similarly, "Ohio's State Tests Rules Book" contains "Procedures for a Possible Test Security Violation," which require staff to "[c]all the Office of Curriculum and Assessment," the very office in which Vaughn worked. Fledderjohann contacted Vaughn for guidance and clarification and thus followed these employer-provided instructions. Even if Fledderjohann went above his immediate superiors in the chain of command to report the alleged violations, he did not go *outside* the chain of command. And reporting of testing violations was not "distinct from" Fledderjohann's

obligations as a third-grade teacher. *Ibid.* One of his job's "[e]ssential [f]unctions" was to uphold testing security, and Fledderjohann received specific training before the AIR exam on just how to report possible cheating.

Moreover, the fact that Ahrens and Luebke were two of the designated officials to whom Fledderjohann was supposed to report does not lead us to conclude that Fledderjohann spoke as a private citizen rather than as an employee. The text of Fledderjohann's December 22 email to ODE demonstrates a concern with the responsibilities of an educator rather than a "citizen's concern" about possible testing violations. *Holbrook*, 658 F. App'x at 288. Fledderjohann stated that he was "an educator at a public school checking on AIR testing" and that he was aware of certain conduct "[a]t our school." After describing each incident, Fledderjohann asked whether it was "ok" or "allowed." He also asked "[w]here specifically, if at all does [sic] 'rules' tell or spell out, that an educator should report such breaches and how to report . . . if any as listed above are breaches?" (ellipsis in original), whether there would be "consequences" if the conduct described were improper, and—if there were no consequences—whether teachers were "all allowed to do the above? Is it ok?" Fledderjohann signed the email "concerned educator."

These statements suggest that Fledderjohann intended to convey his worries as a "concerned educator" and that he was seeking clarification as to whether certain practices were allowed, in part to clarify his performance of his own duties. These statements do not indicate that Fledderjohann's email was meant as a way to "blow the whistle" on alleged perpetrators. This conclusion is bolstered by the fact that Fledderjohann sent the email over a month after the test, as well as by his deposition statements. For example, when he was asked: "Would it be fair to say that in your making the report that you did to Ms. Vaughn, you thought this is a serious matter?" he responded: "No, not necessarily. I wanted to clear my conscious [sic]. I wouldn't say,

I wouldn't say I really made a report. I was, more or less, *asking for questions and clarity because of the concerns I had with the integrity of the test*" (emphasis added). When asked again whether he had emailed ODE because he just "had concerns you were seeking clarification on," Fledderjohann said "Yes."

Most notably, Fledderjohann admitted: "I really didn't believe there was a violation. After one, two, three, four things happened, it just seemed strange that *I missed some opportunities to help my students*" (emphasis added). When asked what he meant by having "missed opportunities," Fledderjohann said that he was unsure whether he was "supposed to leave my posters up" or whether "Mr. Ahrens is allowed to come in" and that he had thought he "goofed up" and thus "needed to call the State for clarification." These statements suggest that Fledderjohann was concerned primarily with his own responsibilities as a teacher and whether he had erred in the way he administered the test. They do not suggest that he emailed ODE as a citizen wishing to bring to light potential violations of state-testing protocols. Put simply, Fledderjohann's emails to ODE and his deposition statements all express a concern regarding his *responsibilities as a teacher*. They do not express a larger concern about the test or its protocols more generally.

Our cases have focused on the context and purpose of the speech in determining whether it is public or private. In *Haynes v. City of Circleville*, Haynes, a canine officer, was fired after writing a memo to the Police Chief expressing his displeasure at a decrease in pay that canine officers would receive for training time that they spent with their dogs. 474 F.3d 357, 360 (6th Cir. 2007). Haynes alleged a First Amendment retaliation claim against the city, but we rejected the argument because "[t]he context of the memo as a whole is best characterized as that of a disgruntled employee upset that his professional suggestions were not followed as they had been

in the past." *Id*. at 364. We also noted that "Haynes's own lawyer characterized the dispute as a training disagreement." *Ibid*. And in *Holbrook v. Dumas*, we held that a fire chief was speaking as an employee when he emailed fellow firefighters informing them that "we could potentially be out of a job, per the conversation I had with" the village manager because he sent the "e-mail in his role as Fire Chief, not simply as a concerned citizen." 658 F. App'x at 281, 287. In support, we observed that "the purpose of the e-mail is evident in the text of the message. Holbrook, as Fire Chief, wanted to alert his employees as soon as possible to a development he just learned about that potentially jeopardized their employment," and that the email did not "reflect[] a citizen's concern about mismanagement" in governance. *Id*. at 288.

Fledderjohann's situation is no different. The *context* of his email to ODE is best characterized as that of a "concerned educator" who wanted to know whether certain practices were "ok" or "allowed." Moreover, Fledderjohann's deposition statements characterized his correspondences to ODE as asking for "clarification" and more concerned with whether he had "missed opportunities" to help his students and did not reflect any desire to blow the whistle on purported testing violations.

\* \* \*

We hold that Fledderjohann has failed to demonstrate a genuine issue of material fact about whether he spoke as an employee when he corresponded with ODE and thus cannot establish that his speech was constitutionally protected, precluding his First Amendment retaliation claim. The district court's grant of summary judgment to the defendants is AFFIRMED.